(C. D. 560)

A. J. MURRAY & Co. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided November 28, 1941)

*Eugene R. Pickrell* (*Eugene A. Chase* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*James F. Donnelly*, special attorney), for the defendant.

Before CLINE and KEEFE, Judges

KEEFE, Judge: This is an action to recover alleged excess of duties exacted by the collector at New York on a shipment of linseed oil fatty acids from Rotterdam, Holland. Duty was assessed thereon as an unenumerated manufactured article at 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930. The plaintiff claims that the merchandise is raw or unmanufactured and therefore dutiable

at only 10 per centum ad valorem under the same paragraph, or that it is dutiable at the same rate as a waste under paragraph 1555, the latter claim not being stressed.

At the trial, three depositions were admitted in evidence as exhibits 1, 2, and 3, two of which consist of descriptions of the method of production used by the manufacturer, and the other identifying the merchandise at bar as the product of such manufacturer. The plaintiff called two chemical engineers who testified concerning the method used to produce the merchandise and as to whether or not they considered that it was a manufacturing process. The Government likewise introduced two chemical experts whose testimony covered the same field as that of plaintiff's witnesses. It was agreed between the parties hereto that the description of the manner in which the goods were processed was as follows:

Linseed Oil is mixed with about 25% water and is heated for 36 hours in a closed tank (with only a small outlet for steam), while adding 1% acid decomposing oil, which acts as catalyst. After about 36 hours the steam is shut off and the tank is left undisturbed for a few hours. The glycerin water, which has a greater specific gravity than the fatty acids, settles on the bottom of the tank, while the fatty acids float on top. The glycerin water is now tapped off and the fatty acids are tapped (drawn-off) into the fatty acid tanks in order to thereupon be transferred into barrels or drums for shipment. This is the only operation to which the oil is subjected.

Plaintiff's first witness testified that the method of production used by the manufacturer, as appearing in the depositions, was known to him as the Twitchell process; that the components of crude linseed oil are glycerin, linseed fatty acids, and minor amounts of protein with some water; that linseed oil occurs in nature in ripened flaxseed; that in the immature seed glycerin is first formed and then the fatty acids; that in the process of ripening the two basic hydrocarbon radicals are united by oxygen through a natural reaction known as esterification, forming linseed oil; that, after extraction from the ripened flaxseed, the raw linseed oil consists of fatty acid radicals and glycerol radicals, neither of which can exist except in combination with each other; that raw linseed oil is the subject of a continuous hydrolysis when stored, as well as to a continuous esterification, the reverse of hydrolysis; that therefore there is a constant interchange going on with different molecules of the linseed oil taking part and, although the esterification and hydrolysis processes tend to balance each other, all of the fatty acid radicals in linseed oil, over a period of time, have existed as free fatty acids; that upon storage of linseed oil the basic hydrocarbon radicals are separated into glycerin and fatty acids to the extent of 1 or 2 per centum of fatty acids; that in the separation thereof the fatty acid radicals pick up hydrogen from water to form fatty acids and the glycerol radicals pick up hydroxyls or hydrogen from water to form glycerin, the reagents effecting the

chemical change remain substantially unchanged although the result is that the free fatty acids and the glycerin are separated; that such natural process was too slow for commercial purposes as it would take years to develop considerable quantities; and that the process used by the manufacturer merely hastens the hydrolysis which would have occurred naturally in time. The witness admitted, however, that raw linseed oil contains little or no glycerin as such and only a small percentage of fatty acids as such; that the majority of fatty acids are chemically combined with the glycerin under the designation of "fatty acid radicals" and "glycerol radicals," neither of which can exist in the free state; that the fatty acids combined with the glycerin in linseed oil exist as a distinct entity, and as a different chemical compound known as glyceride ester; and that, to obtain the fatty acid from the linseed oil, it is necessary to split up such chemical compounds.

The witness further testified that hydrolysis is a reaction taking place between a raw linseed oil compound and water resulting in a new product not existing as such in raw linseed oil; that the components of water, $H_2O$, liberate the acid and alcohol in the case of esters and the water splits up and becomes something else; that the product formed by hydrolysis has many of the characteristics of raw linseed oil as well as different ones which, with its similarities, make it a valuable product; that the linseed oil and the fatty acids are both valuable for their drying characteristics, although the fatty acids are used for drying purposes in another connection than linseed oil, which, unlike fatty acids, is valuable as a vehicle in paint. Inasmuch as the fatty acids exist in the oil in the form of acid radicals and the glycerin as glycerol radicals, and by means of the methods used by the manufacturer were obtained in their free state, the witness was of the opinion that nothing new had been created by the chemical reaction. He admitted, however, that, although the differences are due to the acid radicals being combined with glycerol radicals in the one case and with hydrogen in the other, the fatty acid radicals are chemically combined with glycerol radicals to form linseed oil and that linseed oil is a different chemical entity from either the fatty acid radical or the glycerol radical and also that the fatty acids and glycerin obtained by hydrolysis are different entities.

Plaintiff's second witness also testified along the same lines that the fatty acids produced by the Twitchell process are the same fatty acids occurring in nature.

Defendant's first witness testified that his company uses practically the same method as used herein to produce linseed oil fatty acids; that the Twitchell method is known as a saponification process, whereby a soap or fatty acid and glycerin is formed as the result of the reaction of an oil with either water or any alkali; that in linseed oil there are

the components for making fatty acid but they are not present as an acid; that there is present in linseed oil a glyceride of fatty acids, without which there is no linseed oil; that such glyceride is composed of glycerol radicals and fatty acid radicals, which exist separately in theory only; that when starting with a molecule of linseed oil, after hydrolysis, there appears three groups of fatty acids and one molecule of glycerin; that in such process a chemical reaction takes place resulting in the creation of new chemicals and in such reaction there is a rearrangement of the molecular formation resulting in the formation of fatty acids and glycerin; that by hydrolysis the addition of the hydrogen atom to the fatty acid radical creates a new chemical entity entirely separate and independent of the constituents of raw linseed oil; and that the fatty acids known as such in the trade, in use under the name of linseed fatty acids, consist of a mixture of various types of fatty acids which have certain properties when combined.

The witness further testified that only 1 or 2 per centum of fatty acids exist in the raw linseed oil as fatty acids; that after processing the yield is about 95 per centum of fatty acids; that the fatty acids so produced have different characteristics from linseed oil, both physical and chemical; that in his experience of testing raw linseed oil under storage conditions he has found that the fatty acid content after 2 years' storage would increase to about 3 per centum, whereas in the Twitchell method the fatty acid is increased within 2 days from 2 per centum to 95 per centum.

The second witness on behalf of defendant testified that linseed fatty acids are used in the manufacture of soaps, synthetic resins of the alkyd type and as a component of driers, but are not used separately as a drier, because the element which performs the drying on oils is a metal and any other material besides acids may be used there; that he is familiar with the process of production of the merchandise herein; that hydrolysis is a chemical reaction and it results in the formation or creation of entirely new products the same as calcium carbide (a chemical compound) which, with the addition of water (a chemical compound), creates acetylene gas; that there the hydroxyl or (OH) group of the water and the hydrogen of the water unite with the carbide, forming acetylene gas and the same reaction with water takes place in the present product; that linseed oil is a compound of a fatty acid radical and a glycerol radical; that the glycerol radical is not gylcerin and the fatty acid radical is not fatty acid, the glycerol lacking the essential (OH) group and the fatty acid lacking the essential hydrogen; that the hydrolysis adds the hydrogen to the fatty acid factor, without which there is no acid, because an acid is always dependent upon the presence of hydrogen and its characteristics are purely determined by the presence of hydrogen; that hydrolysis creates new entities having physical and chemical characteristics

different from linseed oil; that there is a vast difference between the enzyme action (unorganized ferments existing in seeds) occurring naturally and that occurring in an industrial process with the Twitchell reagent, because, in the natural reaction, such as the enzyme action, specifically lipase, which means an enzyme which splits oil, the enzyme is present in the natural flaxseed, but normally does not have an opportunity to act very much; that when it does act, however, it produces some free fatty acid; that such reaction reaches an equilibrium beyond which it does not act, while in the Twitchell process, the same reaction taking place is definitely controlled; that there is an equilibrium factor in each reaction, which in the manufacturing operation is overcome by the presence of steam and pressure and the reaction is forced to practical completion, almost 100 per centum, while in the natural enzyme, linseed oil may stand for 10 years and 100 per centum acid would not be attained; that in his experience he has found under the worst possible conditions, with water present in the oil, the natural enzymes would not enable more than 20 per centum free fatty acids to be present; and that regardless of the process used, the splitting of the factors is a chemical reaction and new products are formed.

The plaintiff contends that the merchandise in question consists of a material appearing in nature and that the processes undertaken were merely necessary to obtain the product by itself and are not to be considered as manufacturing operations. In support of such theory the plaintiff stresses the fact that the merchandise at bar is first formed as free fatty acids in the seeds of the flaxseed plant; thereafter the glycerin appears therein. Then through a natural process known as lipase these two ingredients combine in the ripened seed to form triglycerides. Therefrom it is argued that such free fatty acids could have been separated from their native habitat and such separation would not have constituted a process of manufacture. Therefore when nature causes these two materials to combine in the flaxseed into linseed oil, the enzyme action which assists such combination and which also aids in its natural separation into fatty acids and glycerin continually within the oil itself, without any external assistance, would not constitute a manufacturing process. Consequently the hastening of the natural process of splitting through the aid of a catalyst brings about nothing more than the natural reaction and such acceleration of a natural process is not sufficient to constitute a manufacturing process. The plaintiff further contends that inasmuch as all of the fatty acids contained in the linseed oil, whether free or combined at any particular moment, have existed as free fatty acids, over a period of time, a separation of the same from their native state, whether or not free at the time of separation, is not to be considered a manufacturing process for tariff purposes.

The Government, on the other hand, maintains that the fatty acids in question were produced by means of a chemical reaction whereby linseed oil was changed into two entirely new and different products, one of which was imported herein, and that such product was the result of a manufacturing operation and is to be regarded as a manufactured article.

The only question arising herein is whether or not the imported merchandise, claimed to have been derived solely from a treatment designed to free a product found in nature from its native surroundings, is to be regarded for tariff purposes as a manufacture.

In a long line of cases the courts have held that any change, no matter how slight, may be a manufacture, when such change results in a substance having a new name, or new character or new use. See *Hartranft* v. *Wiegmann*, 121 U. S. 609; *Tide Water Oil Co.* v. *United States*, 171 U. S. 210, 216; *United States* v. *Dudley*, 174 U. S. 670; *Baumgarten* v. *Magone*, 50 Fed. 69; *Anheuser-Busch Brewing Assn.* v. *United States*, 207 U. S. 556; *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963. Changes in the chemical constituents of an article have also been held to constitute a manufacture, as noted in Government brief in the cases of *In re Alden*, T. D. 15317, G. A. 2751; *Tower* v. *United States*, Abstract 39608; *United States* v. *Schrock & Squires*, 5 Ct. Cust. Appls. 444, T. D. 34974; and *Standard Varnish Works* v. *United States*, 59 Fed. 456.

Inasmuch as both the fatty acids and the glycerin exist in a free state in flaxseed, is the operation applied to linseed oil in order to free the fatty acids to be regarded as a manufacturing process? The plaintiff insists that it is not to be so regarded and cites several decisions dealing with the separation of a natural article from its native tissue, or the recovery of the residue of a natural article remaining after it has undergone a process of consumption, as the recovery of opium from the ashes after it has been smoked. The Government fails to point out any authority holding that the recovery of a native substance from its surrounding tissue is to be regarded as a manufacturing process. The decision particularly relied upon by the Government, to wit, *Standard Varnish Works* v. *United States*, supra, involved an article known by various terms, such as candle tar, candle pitch, palm pitch and candle residuum, produced from tallow, animal grease and palm oil by steaming the mixture in closed retorts and removing the stearine therefrom by distillation, leaving the residuum in question. The court there found that the merchandise was something left over in the manufacture of candles which was neither tallow, animal grease nor palm oil; that it was not in itself a raw material, nor something found in nature, and held that it was a byproduct resulting from a manufacturing operation. Here, the situation is

different as the resultant product, fatty acids, is found in nature, at least in the immature flaxseed.

Raw linseed oil, a commercial product specially provided for in the tariff act, was subjected to further processing which destroyed the linseed oil and caused to emerge two products other than oil, one of which is the subject of importation. The method used in the production of the imported article is of little weight in determining the classification thereof, inasmuch as two new products were evolved as the result of a chemical reaction, which ordinarily would come within the definition of a manufacture. Is the manipulation applied to the linseed oil in the manufacture of fatty acids to be discounted because of the fact that fatty acids are native to the unripened flaxseed? We are unable to agree that it should be so regarded.

The linseed oil, itself, is recognized as a manufactured article, and so announced by the Supreme Court in the case of National Lead Co. v. United States, 252 U. S. 140, although such an oil would not be regarded as a chemical compound, as stated by our appellate court in the case of Bush v. United States, 11 Ct. Cust. Appls. 246, T. D. 39076. The court there stated that an oil which is not so chemically treated as to convert it into a substance which is not an oil or fat is not a chemical compound. However, an oil which has undergone a chemical reaction resulting in a completed article recognized in commerce by a specific and distinctive name other than the name of the material, and designed and adapted for a particular use, is deemed to be a manufacture and this is true although its component material may remain unchanged. See United States v. Meier, T. D. 25973. Here it is even more self evident that the processes applied to the linseed oil result in a manufacture within the legislative understanding of such term because the component material of a previously manufactured article is admittedly destroyed by chemical reaction and two radically different chemical products emerge from the manipulation of the oil.

In the case of Jefferson v. United States, 18 C. C. P. A. 322, T. D. 44583, our appellate court stated that the courts have gone no further than to designate those cleansing and separating steps which are taken for the purpose of putting the raw material in decent and workable condition. In the case of United States v. Makaroff, 16 Ct. Cust. Appls. 531, T. D. 43263, the court stated that as a general rule, a mere cleansing process, the purpose of which is to isolate the article of commerce from impurities, and which does not advance it beyond a clean state or condition, and which does not affect the article per se, cannot be said to be a process of manufacture, preparation, or preservation of an article. The subject there under controversy consisted of certain caviar made from sturgeon roe. In separating the roe from its surrounding tissue, it was placed in a solution containing a small amount of common salt. The roe was not only cleaned but the salt tended to harden the roe and give it rigidity. Because of such fact,

the court held that the roe was no longer a raw or unmanufactured article.

Linseed oil, the manufactured product from which the fatty acids in question were derived, is native to ripened flaxseed and is removed therefrom by methods of compression. However, free fatty acids and glycerin which have combined to make linseed oil have not been shown to be either free or native to the ripened flaxseed at the time of compression. They appear in that state in the immature seed. If the fatty acids were extracted from the immature seed, such operation might be considered as a process intended to free a native substance from its surrounding tissue rather than a process of manufacture. Inasmuch as the native state of linseed oil in the seed is neither free fatty acids nor glycerin, and a subsequent processing of an article is necessary in order to transform its constituents to a state in which they appear at one period in the natural flaxseed, the rule, as announced by the courts of not regarding processes of separation as manufacturing operations, in our opinion, would be unduly enlarged were it held to include such processes as were here applied to linseed oil. Linseed oil is a stable article of commerce and therefore does not possess the inherent characteristics of splitting up into its component parts. The formation of fatty acids and glycerin through the natural splitting and subsequent esterification, so that at one time or another in the oil all of the fatty acid units were free, presents an insufficient basis upon which to predicate the theory that an artificial hastening of the splitting would not be regarded as a manufacture, particularly in view of the evidence that the constant action within the oil was controlled by means of an equilibrium factor which prevented the oil from disintegrating and had it not been for the processes applied to the oil no fatty acid in commercial quantities would have been produced.

In the case of *United States* v. *Half Moon Manufacturing & Trading Co.*, 24 C. C. P. A. 232, T. D., 48668, certain merchandise invoiced as vegetable albumen, classified as a nonenumerated manufactured article, was claimed to be unmanufactured. The basic natural material there was wheat from which flour had been milled. From the wheat flour the manufacturer was interested in the production of the starch native to wheat, which was accomplished merely by mixing the flour with water, kneading, and washing out the starch. The residue constituted the vegetable albumen in question, which was dried in order to prevent fermentation and ground so as to prevent undue absorption of moisture and to facilitate packing for transportation. The court observed that the chief constituents of wheat flour are starch, gluten, water, fat, and ash; that the vegetable albumen therein was gluten; and that the involved merchandise did not have all of the qualities of wheat flour from which it was produced, and

neither did the starch, but each had some of the qualities, if not the precise uses of such flour. The court held that the starch and the gluten was each sought for its valuable properties and constitutes a manufacture of starch and a manufacture of gluten, notwithstanding that the starch and the gluten appeared in its native state in the wheat from which the flour was derived.

If gluten, a native constituent of wheat, is to be properly regarded as a manufactured article upon extraction from the flour of wheat, through processes of washing with water, without chemical reaction of any kind, the creation, by means of a chemical reaction from linseed oil, of a fatty acid, which is neither native to linseed oil nor to ripened flaxseed from which it is derived, is also brought within the tariff meaning of a manufacture.

For the reasons stated, we are of the opinion that the fatty acids in question were properly assessed for duty as a nonenumerated manufactured article under paragraph 1558, act of 1930, and judgment will therefore be entered in favor of the defendant.