(C. D. 1008)

McLAUGHLIN & FREEMAN *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 14, 1946)

*Eugene R. Pickrell* (*Eugene A. Chase* and *Richard H. Amerman* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*William J. Vitale* and *Richard F. Weeks*, special attorneys), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges; CLINE, J., dissenting

KEEFE, Judge: The merchandise in question, invoiced as peanut acid oil, was assessed for duty by the collector as a nonenumerated manufactured article at 20 per centum ad valorem under paragraph

1558 of the Tariff Act of 1930. The plaintiff claims that the material is a waste and as such properly dutiable at 10 per centum ad valorem under paragraph 1555. By way of amendment of the protest, it is further claimed that the material is a raw or unmanufactured article and dutiable at 10 per centum ad valorem under paragraph 1558.

At the trial counsel for the plaintiff introduced in evidence as exhibit 1 a deposition of the manager of the factory producing the imported material. Answering direct interrogatory No. 21, describing the production of the material, the affiant stated:

A. Crude peanut oil is neutralized by adding a basic solution in order to produce in this way an edible oil from crude oil. How this neutralized oil is further worked has no bearing on this suit. The remaining fatty acids, bound to a part lye and neutral oil, settle on the bottom of the neutralizing tank. By adding sulfuric acid, the lye is neutralized and in this way a useful fatty acid (acid oil) remains.

Answering direct interrogatory No. 22, where it was asked whether or not the process used was the separation of the free fatty acids which occur naturally in the peanut oil used in the production of the peanut acid oil from the other constituents in the peanut oil, the affiant answered:

A. It is the separation of the free fatty acids which are present in the oil.

And in answer to direct interrogatory No. 23 as to whether the peanut acid oil was a sought or unsought product the affiant answered:

A. The fatty acids which are released during the refining are a pure waste product and therefore unsought.

Dr. Harvey A. Seil, an analytical, consulting, and research chemist, also testified on behalf of the plaintiff that he had experience in working with vegetable oils, including peanut oil; that the common process in refining vegetable oils is to separate the fatty acids in the crude oil by means of neutralization with a basic solution; that the fatty acids are treated with sulphuric acid and thus separated from other impurities; that a crude peanut oil containing 5 per centum of free fatty acids is inedible because of its obnoxious taste and the effect it has upon the throat; that free fatty acids are an undesirable constituent of an edible peanut oil, and are not susceptible of use in the edible oil industry; that free fatty acids are entirely different chemically and physically from edible peanut oil and are an unsought byproduct in the refining of peanut oil; and that *the fatty acids as imported are the same fatty acids that were present in the original oil*, although containing some of the color of the original oil, any resin that might have been present therein, and also any other acidic constituent thereof. As to

the character of the fatty acids removed from the crude peanut oil, the witness testified as follows:

Q. Do the imported fatty acids have a name any different than they had as they occurred naturally?

A. No, they are the same acids.

Q. Do they have any different character than they had as they occurred naturally?

A. No, except as I explained before, they may have some impurities from the oil that is contained in them.

Q. Do the free fatty acids as imported have any different use than the fatty acids which occur naturally, other than that perhaps they have been made available for use?

A. No, they have not. (Record page 13.)

When asked if he agreed with the answer to direct interrogatory No. 21, the witness answered:

A. Yes, after the separation, of course, of the soap formed by the addition of the basic substance. The mere addition of the basic substance without separation wouldn't make an edible oil.

X Q. Then is it that you disagree with that first sentence?

A. Will you read that again, to be sure?

X Q. [Reading:] Crude peanut oil is neutralized by adding a basic solution in order to produce in this way an edible oil from crude oil.

\* \* \* \* \* \* \*

A. That would not make an edible oil as far as you have gone.

X Q. Then you disagree with that first sentence of that answer?

\* \* \* \* \* \* \*

A. The mere addition of a basic substance to a fatty oil containing free fatty acid would not render it an edible oil.

\* \* \* \* \* \* \*

X.Q. I will read the rest of the answer: "How this neutralized oil is further worked has no bearing on this suit." Now do you know whether that is a correct statement?

A. I don't know.

X Q. [Quoting further:] The remaining fatty acids, bound to a part lye and neutral oil, settle on the bottom of the neutralizing tank.

A. That is true.

\* \* \* \* \* \* \*

X Q. [Reading:] By adding sulphuric acid, the lye is neutralized and in this way a useful fatty acid (acid oil) remains.

A. It is perfectly obvious that they must have separated it.

X Q. In other words, there would have to be a separation?

A. There would have to be a separation of the oil from the soap solution, because otherwise when you put your sulphuric acid in you would come back to exactly where you started. Your fatty acid would go back into your original refined oil.

X Q. [Reading question and answer to direct interrogatory No. 22:] \* \* \* Do you agree with that statement?

A. Yes, but that also shows, sir, that they must have separated the aqueous solution from the oil solution; otherwise there wouldn't have been a separation. (Record pp. 14/16.)

Dr. McSorley, chief chemist at the United States customs laboratory, testified on behalf of the Government. He described samples which were illustrative of the production of peanut acid oil in its different stages from crude peanut oil. A small bottle of crude peanut oil was admitted in evidence as exhibit 2. It consists of a yellowish liquid having a small portion of whitish sediment at the bottom of the bottle. After the crude peanut oil is treated with an alkali, a sample thereof being admitted in evidence as exhibit 3, the oil is heavier in texture than the oil in exhibit 2 and the color is much darker. At the bottom of the bottle there is considerable whitish sediment, the bottle containing two-thirds oil and one-third sediment. The top, or oil portion, was described by the witness as peanut oil deprived of its free fatty acids and consequently considered to be a refined oil. The sediment, or bottom portion, according to the witness, was a water solution of alkali salts of the fatty acids originally in the crude peanut oil, and known as "foots" or soap stock.

A sample of the peanut oil foots or soap stock, not acidulated, was admitted in evidence as exhibit 4. It consists of a mass of yellowish material in which there is a small quantity of liquid the consistency of water. The witness testified that if the material in exhibit 4 were treated with sulphuric acid the fatty acids will rise to the top, and a water solution of sodium sulphate, sodium chloride, salts, or other impurities will remain at the bottom, and that the top portion consists of peanut acid oil and the bottom portion consists of impurities to be discarded.

Exhibit 5 was admitted in evidence as illustrative of the peanut acid oil and impurities after such material, as represented by exhibit 4, had been treated with sulphuric acid. There are two distinct layers of material such as exist when oil is placed in a bottle with water. At the bottom of the top layer, a yellowish oily liquid, there is a slight quantity of whitish sediment. Underneath this oily layer is a perfectly clear liquid which contains no sediment of any kind. The top layer is the peanut acid oil such as is here imported.

After reading direct interrogatory No. 21, the Government's witness testified that in his opinion the affiant omitted one or two essential steps in describing the process of manufacture, and that he differed with the affiant in that the fatty acids, liberated from the neutralization process, are not exactly the same fatty acids which occurred in the original peanut oil; that in treating the crude peanut oil with alkali, such as sodium hydroxide or sodium hydrate, one atom of hydrogen in the free fatty acids in the crude peanut oil is neutralized with the sodium from the alkali; that when the sludge or foots are subsequently neutralized and slightly acidified with sulphuric acid, one hydrogen atom from that sulphuric acid goes into the fatty acids,

substituting for the sodium that was combined with the original sodium salts of fatty acids extracted from the crude peanut oil; and that therefore the final peanut acid oil contains one atom of hydrogen which was not in the original acids of the crude peanut oil.

The witness admitted that the free fatty acids resulting from the separation process of the refined peanut oil were not any different from the free fatty acids found in the crude peanut oil, except from the difference in one hydrogen atom per molecule of fatty acid. The witness was of the opinion that such hydrogen atom was derived from the sulphuric acid. In other words, the only difference between the free fatty acids as contained in exhibit 5 and the free fatty acids in exhibit 2 is one hydrogen atom per molecule of fatty acids. The witness was of the opinion that the hydrogen which makes the fatty acids an acid comes from the sulphuric acid. Although admitting that there were hydrogen ions present in the solution before the addition of the sulphuric acid, the witness believed that such hydrogen atoms would not combine with the acid radical. As to the identity of the material, the witness testified as follows:

X Q. How can you tell which hydrogen ion is going to combine with which fatty acid radical?

A. Well, it is difficult to tell.

X Q. Have you any way of labeling them so that you can tell which ones are going to hook up?

\* \* \* \* \* \* \*

A. I have no way of labeling them, but from my study and knowledge of chemistry, the hydrogen that is in the final fatty acids in the peanut acid oil is the hydrogen from sulphuric acid; and I know that because if you allow this material to stand this sludge in the bottom with, as you say, hydrogen atoms present—hydrogen ions present—that won't automatically change to peanut acid oil; there would be no reaction takes place at all. Whereas, when you add hydrogen from sulphuric acid you get that reaction immediately, and in my estimation and judgment it is the hydrogen from that sulphuric acid that combines with the acid radical to form the arachidic acid, oleic acid, linolic acid, and other acids which are in peanut acid oil.

X Q. Actually is there any way that you can identify the hydrogen ions that combined with the acid radicals?

\* \* \* \* \* \* \*

A. No, there is no way you can identify them.

X Q. Does it make any difference which hydrogen atom you have combined with which acid radical in the peanut acid oil, as shown in Illustrative Exhibit 5? Is it not just exactly the same product, regardless of what hydrogen atoms are in it as acid ions?

A. I don't say it is exactly the same product. I say it is an equivalent product. It is a product which is equivalent to all intents and purposes, but it isn't the same product, because in saponifying the fatty acids to combine them with soda you have substituted one hydrogen with a sodium atom. In decomposing the sludge, which is a result of that treatment, with alkali—decomposing the sludge you have picked up a hydrogen atom from the sulphuric acid which was not present in the original peanut oil. Theoretically, I think that is theoretical and I think it is sound, but as far as the final product is concerned it doesn't make any difference.

X Q. As a matter of practical procedure the peanut acid oil shown in Illustrative

Exhibit 5 is identical with the peanut oil acids that were present in Illustrative Exhibit 2, are they not?

A. I would not say so, no.

X Q. As a matter of practical talk now, Dr. McSorley, would there be any way chemically or otherwise of differentiating between them?

A. We have no way of differentiating between them, no. (Record pp. 46–48.)

The claim that the merchandise at bar is classifiable as a waste was not stressed at the trial nor in brief of counsel. Inasmuch, however, as the sludge or foots remaining after the removal of the refined oil is the only waste product, a further treatment or fabrication thereof would, of course, be sufficient to remove it from a classification as waste. The only question at issue is whether or not the peanut acid oil here imported is a naturally occurring substance in peanut oil which has been, through the processes employed, separated from its native condition and brought to a state suitable for shipment without affecting its original character.

The manager of the exporter and Dr. Seil, plaintiff's witness testified positively that the peanut acid oil imported was the same peanut acid oil found in crude peanut oil. Government witness admitted that the free fatty acids as imported were not any different from the free fatty acids found in crude peanut oil, but because of his theory that the hydrogen ions necessary to change the salts back into acids were drawn from sulphuric acid rather than from other sources in the residual material, the free fatty acids imported were not the free fatty acids in the crude peanut oil. Although the Government witness was unable to substantiate his theory that the hydrogen ions were taken from the sulphuric acid, we are of the opinion that had it been established that the hydrogen ions in the peanut acid oil were from outside sources, the peanut acid oil could nevertheless be identified as the same free fatty acids appearing in crude peanut oil.

Dr. Seil testified as to the affiant's description of the processes used in producing the imported material that there must have been a separation of the edible oil from the residue after the addition of the alkali because, if there were not such separation, the addition of the sulphuric acid would cause a return of the substance to the state of crude peanut oil. That crude peanut oil might not be exactly the same crude peanut oil respecting the identical ions of the different substances theretofore contained in the crude peanut oil, but to all intents and purposes it would be the same substance. The alkali was added to the crude oil for the purpose of extracting the acid oils from their native oily tissue. The acid was added to the residue to restore the acid oils to their original state. To all intents and purposes the same fatty acids are found in the crude peanut oil. Such restoration would compare with the transmission of one's voice over the telephone. The sound we hear is the voice of the person telephoning, but actually the sound waves composing that voice have been broken down into electric im-

pulses and then rebuilt so that we hear the same voice. That is true also of all radio reception; the sound waves are so manipulated as to restore them to their original sounds.

We are not impressed with the Government's contention that the refining processes used to produce an edible peanut oil left a residue of alkali salts and that any further chemical reactions taking place merely produced a new article of commerce differing from the salts, and that such new article, so produced, is dutiable as a nonenumerated manufactured article. The soap stock or foots may have been imported as a waste material, a residuum in the production of refined peanut oil, but the further treatment of the soap stock was not for the purpose of manufacturing such soap stock into a valuable product. Rather it was a continuing process of extraction therefrom of the fatty acids contained in the crude peanut oil. When such fatty acids have been removed from their native state they are still raw or unmanufactured articles and are not to be considered manufactured.

For the reasons stated judgment will be entered in favor of the plaintiff directing the collector to reliquidate the entry, and make refund of duty according to law.

### DISSENTING OPINION

CLINE, Judge: I regretfully dissent from the decision of majority in this case.

The issue in this case involves the classification of merchandise known as peanut acid oil. According to one of plaintiff's witnesses, it is derived from crude peanut oil as follows:

Crude peanut oil is neutralized by adding a basic solution in order to produce in this way an edible oil from crude oil. How this neutralized oil is further worked has no bearing on this suit. The remaining fatty acids, bound to a part lye and neutral oil, settle on the bottom of the neutralizing tank. By adding sulfuric acid, the lye is neutralized and in this way a useful fatty acid (acid oil) remains.

Dr. McSorley, a witness for the defendant, elaborated on the process. He stated that after neutralization of the free fatty acids in the crude peanut oil by the addition of a basic solution, the material is agitated, then allowed to settle. A substance known as foots or sludge or peanut oil soap stock, consisting of an alkali salt of the free fatty acids in water solution, settles at the bottom and the refined oil remains at the top. The next step is to draw the refined oil off from the top or to draw the soap stock from the bottom. The refined oil may be filtered through bone black or fuller's earth to lighten it in color. The foots or soap stock is treated with sulphuric acid which decomposes it and the fatty acids rise to the top and at the bottom is a water solution of sodium sulphate, sodium chloride, salts, and impurities. These fatty acids or peanut acid oil are then withdrawn and used in making soap or esters.

To summarize, an alkaline solution, for instance, sodium hydroxide, is added to crude peanut oil (which contains fatty acids) making refined peanut oil and peanut oil soap stock (containing fatty acid salts). To the peanut oil soap stock is added sulphuric acid making peanut acid oil (or fatty acids) and a water solution of sodium sulphate, sodium chloride, salts, and impurities.

According to the testimony, crude peanut oil may be refined to make an edible peanut oil, may be sulphonated to make a sulphonated oil, and may be used in a variety of commercial processes. Refined peanut oil is an article of food. Free fatty acids are used in the manufacture of soap or in making esters.

The evidence shows that about 5 per centum of free fatty acids are naturally present in crude peanut oil and that they cannot be separated physically from the oil by any ordinary means. Dr. Seil testified that the separated free fatty acids are the same as those that occur naturally except that they contain impurities. On the other hand, Dr. McSorley testified that the free fatty acids obtained were not identical with those occurring naturally because in the process of separation the hydrogen ion of the original free fatty acids combines with the hydrogen ion of the sodium hydroxide to form water; that the fatty acid radical combines with the sodium to form a salt; that when sulphuric acid is added, the hydrogen from the sulphuric acid combines with the fatty acid and the sodium combines with the sulphuric acid radical to form sodium sulphate. He based his conclusion on the ground that the water solution had nothing to do with the reaction and that no reaction took place until the sulphuric acid was added. Although the witness could not actually identify the hydrogen ion in the final product, from his knowledge of chemistry and from the fact that a reaction occurred immediately upon the addition of sulphuric acid, he believed the hydrogen in the final fatty acid was the hydrogen from sulphuric acid.

Plaintiff claims that the chemical process here involved has merely separated peanut acid oil from its native condition and that therefore it is an unmanufactured article. I am unable to agree with this contention. In view of the uncontradicted testimony of Dr. McSorley and the fact that two chemical reactions have taken place, it does not seem likely that the final product is identical with the free fatty acid occurring in the crude peanut oil. In all probability, some, if not all, of the hydrogen in the original acid has combined with hydroxyl to form water, and the hydrogen from the sulphuric acid has been substituted in the final product. Where an equivalent product is obtained, it cannot be said that the process is merely one of separating something from its surrounding tissue.

In *United States* v. *Half Moon Manufacturing & Trading Co.*, 24 C. C. P. A. 232, T. D. 48668, the imported merchandise consisted of

vegetable albumen obtained from wheat flour. The court found that the chief constituents of wheat flour were "starch, gluten, water, fat, and ash" and that the vegetable albumen involved was gluten. It was obtained by mixing wheat flour with water, kneading it, and washing out the starch in a washing machine. The protein remaining in the machine was afterwards dried and ground and sold as vegetable albumen. The court held that the purpose of the process was to separate starch and gluten; that neither had all the qualities of wheat flour, but each had some of them; and that the merchandise was a manufactured article.

In the instant case, the purpose of the process was to separate the refined peanut oil from the fatty acids or peanut acid oil, each of which has some of the qualities of crude peanut oil. The fatty acids are constituents of crude peanut oil even as gluten is a constituent of wheat. If gluten is to be regarded as a manufactured article upon extraction from wheat flour by a physical process, fatty acids obtained from crude peanut oil by a chemical process must also be regarded as manufactured.

It is to be noted also that the products obtained from crude peanut oil—refined peanut oil and fatty acids—have different uses from the original substance and different uses from each other. Where an article has been so changed or advanced in condition from what it was before processing that it has attained a distinctive name, character, or use, it is a manufacture. *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963.

In *United States* v. *W. H. & L. D. Betz*, 30 C. C. P. A. 16, C. A. D. 208, it was held that Norgine F, a commodity processed from seaweed with sulphuric acid and muriatic acid and neutralized with soda, was a manufacture of seaweeds. The court said (p. 23):

It clearly appears from the evidence of record that the involved Norgine F has been produced by both chemical and physical processes of manufacture; that it has attained a distinctive name and character, different from that possessed by the seaweeds from which it was produced; that, although it is a material from which alginic acid may be obtained, it is, nevertheless, a completed article of commerce, having but one use or class of uses; and that it is not commercially capable of the various uses to which seaweeds may be put.

I do not believe it is correct to say that the merchandise is an *unsought* byproduct or that the further treatment of the soap stock was not for the purpose of manufacturing it into a valuable product. The first chemical reaction was sufficient to obtain the refined peanut oil and the residue could have been discarded or sold as soap stock, had not a further product, peanut acid oil, been desired.

For these reasons, I believe the new article of commerce obtained through a second chemical reaction is dutiable as a nonenumerated manufactured article. The protest should be overruled and judgment rendered in favor of the defendant.