**No. 51524.**—Protest 63972–K of W. A. Cleary Corp. (New York).

KEEFE, Judge: The merchandise invoiced as soybean lecithin, was assessed for duty by the collector as a nonenumerated manufactured article under paragraph 1558, Tariff Act of 1930, at the rate of 20 percent ad valorem. The plaintiff claims that it is unmanufactured and dutiable at 10 percent ad valorem under the same paragraph, or as a waste at 7½ percent under paragraph 1555, as amended by T. D. 49753. By way of amendment of the protest, it is further claimed that it is free of duty under paragraph 1722 as a crude vegetable substance.

The paragraphs of the Tariff Act of 1930, or as such paragraphs have been amended, provide as follows:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.
[PAR. 1555 as amended by the Trade Agreement between the United States and the United Kingdom, T. D. 49753.]
1555. Waste, not specially provided for, 7½% ad val.
PAR. 1722 [free list]. Moss, seaweeds, and vegetable substances, crude or unmanufactured, not specially provided for.

At the trial lecithin was defined as a biological colloid present in every living cell whether of animal or vegetable origin. The material was described as—

* * * not a fat as such. Its chemical composition is distinctly different from fat, and gives it the properties which differentiate it from a fat and which make it useful in places and for purposes that fats cannot be employed. * * * You cannot say that it is like a fat, or like any other substance any more than you can say that a fat is like a protein, or a protein is like a sugar. [Record page 28.]

The witnesses testified concerning the production, character, and uses of the imported merchandise substantially as follows. Lecithin was originally obtained from brain tissues, and later from egg yolk, which contains approximately 12 percent of lecithin. All grains contain large quantities of it, but greater quantities are found in the soy bean than in most other commercially grown seeds. The lecithin, however, is more readily removable from the soybean than from other sources.

The imported product consists of lecithin in a soybean carrier to which it is tightly bound. There is also contained therein a quantity of free oil and soybean oil meal. The free oil and the meal must be removed, the meal by filtering processes, and the oil by centrifugal methods of separation. The imported product also has to be deodorized and decolored before it is in a condition suitable for use by the importer.

Without some sort of an oil carrier, lecithin would oxidize rapidly, thus becoming commercially unusable because it cannot be driven back into solution in the products in which it is to be used. If insufficient soybean oil is available for use as a carrier of lecithin, some other kind of vegetable oil could be used in its place. Although it is possible to obtain 100 percent pure lecithin, commercially, it is contained in an oil carrier.

At the time of importation of the instant merchandise, lecithin was used principally in the chocolate business. Its purpose is to save cocoa butter by reducing the viscosity of the chocolate. For such a purpose the imported product was not usable in its imported condition. The excess oil, the meal, and the typical soybean oil odor had to be removed. Lecithin now has been found suitable for use in connection with paint, enamels, stains, varnishes, inks, lubricating oil, gasoline, creosote, asphalt, rubber, leather, cosmetics, pharmaceuticals, mine sprays, and insecticides. However, in the sales experiences of the witnesses, the product as here imported could not be sold to firms producing the foregoing articles when the refined lecithin was available.

The importers were unable to determine the methods of producing lecithin in Norway. According to one witness, an endeavor was made to ascertain the processes used, but the manufacturer, on the plea of secrecy, refused to disclose the manner of extraction. An article similar to the imported product is produced in the United States as follows:

* * * There are two ways with which I am familiar for its removal, and each of those ways has many ramifications and modifications. One way is to flush the crude oil that has been extracted from the beans with water or steam to scientifically separate the hydrated lecithin from the oil, and then, to dehydrate the lecithin material itself. And another is to take that same crude oil that has been extracted from the beans, soya beans, and to drive the lecithin out of the material by using two other factors: time and low temperatures. The materials obtained in those two ways are, chemically, essentially the same. There are some differences in the potential use of those products but they are the two methods that can, to the best of my knowledge, be successfully used for the extraction of lecithin. [Record pp. 29–30.]

Counsel for the plaintiff contends that the lecithin as imported is in a crude state, not advanced in value or condition for its ultimate use, and is entitled to free entry as a crude vegetable substance, for the reason that it has an objectionable odor and color, contains considerable free oil not tightly bound to lecithin, meal, and other contaminants from the soybean itself. It is argued in that connection that the imported product is in the same condition as found in nature except that it has been separated from a portion of the soybean oil; that it has not been improved *per se* in value or condition, has no commercial use in its imported condition, and extensive processes are required to clean and refine it before it is suitable for introduction into the trade and commerce of the country.

Plaintiff further contends that the lecithin as imported is a residue or refuse resulting from the extraction of oil from the soybeans and is not susceptible of use for any purpose unless further processed. In any event, it is contended, that it is nothing more than a crude product which is unmanufactured.

The Government contends that the plaintiff has failed to sustain the burden of overcoming the presumptively correct classification of the collector, failing not only to prove the product is not a manufactured article, but that it is a crude vegetable substance, or a waste, as that term has been judicially interpreted.

Not being able to ascertain the production methods used by the foreign manufacturer, the importer has not established whether or not the imported product is a refuse material, residue, or waste resulting from a manufacturing process, such as would be classifiable under paragraph 1555 as a waste.

The terms "crude" and "unmanufactured," as appearing in paragraph 1722, have been construed by the court not to be synonymous, inasmuch as an article may be manufactured and yet be crude. It does not necessarily follow, however, that when an article is not to be classed in a tariff sense as manufactured, it must be unmanufactured. See *Togasaki & Co. et al.* v. *United States*, 12 Ct. Cust. Appls. 463, T. D. 40667. The article before us here, from all that appears, is the result of manufacturing processes applied to the soybean. It is not a natural product as it is the oily portions of the soybean, derived through some undisclosed application of labor or machinery, which also contain large quantities of a biological colloid known as lecithin which is present in every living cell. In that respect the imported product is distinguished from peanut acid oil the subject of decision in the case of *McLaughlin & Freeman* v. *United States*, 16 Cust. Ct. 186, C. D. 1008, wherein it was held to be a raw or unmanufactured article rather than manufactured. There, the fatty acids as imported were the same fatty acids present in the original oil and, when removed from their native state, they were held to be still raw or unmanufactured articles. In the case of *Murray* v. *United States*, 7 Cust. Ct. 160, C. D. 560, the importation consisted of linseed oil fatty acids, which were apparently derived in a manner similar to that of the peanut acid oil by means of a chemical hydrolysis. There, linseed oil was changed into a glycerin water and fatty acids. The glycerin was drawn off, leaving the fatty acids which were placed in barrels and shipped without further processing. The testimony in that case, however, disclosed that linseed oil occurs in nature in ripened flaxseed only, but in such ripened flaxseed, fatty acids and glycerin are not present as such. The court was of the opinion, therefore, that when one product, such as fatty acids, is derived by methods of manufacture from another manufactured product, such as linseed oil, the fatty-acid derivative may not be considered as having been produced by processes designed to separate it from its native tissue.

In the product before us here the method of production is not disclosed. Nor are we informed whether or not lecithin, as such, is found in the natural soybean. If it comes into existence only upon the manufacture of the soybean oil from soybeans, it would not be considered a raw or unmanufactured article under our holding in the *Murray* case, *supra*. Unless the plaintiff has established that the imported product is naturally found to be a part of the particular vegetable substance and is derived solely through processes which separate it from such native tissue, and in such crude condition is imported into the United States without further processing, such as would fit it for its chief or only use, it would not come within the definition of a crude substance. See also *United States* v. *Rice Co. et al.*, 9 Ct. Cust. Appls. 165, T. D. 37998.

The question also arises whether or not lecithin is a vegetable substance. The evidence discloses that it is also found in certain animal tissue as well as vegetable. Being a product which is not inherently vegetable, we are of the opinion that it would not come within the definition of vegetable substance, although a component thereof.

For the reasons stated, judgment will be entered in favor of the Government.