(C. D. 1224)

C. J. Tower & Sons *v.* United States

United States Customs Court, Third Division

(Decided March 21, 1950)

*Barnes, Richardson & Colburn* (*J. Bradley Colburn* of counsel) for the plaintiff. *David N. Edelstein,* Assistant Attorney General (*Howard H. Harowitz* and *William J. Vitale,* special attorneys), for the defendant.

Before Cline, Ekwall, and Johnson, Judges

Johnson, Judge: The merchandise at issue in this case is described upon the invoice as "Lecithin, Oil Concentrate, crude." It was assessed for duty at the rate of 20 per centum ad valorem under the provisions of paragraph 1558 of the Tariff Act of 1930 as a non-enumerated manufactured article. The plaintiff claims that the merchandise is properly dutiable at 10 per centum ad valorem under the same paragraph as a nonenumerated unmanufactured article, or at the rate of 7½ per centum ad valorem under paragraph 1555, as amended by T. D. 49753. By way of amendment of the protest, it was further claimed that the merchandise is free of duty under paragraph 1722 as vegetable substances, crude or unmanufactured, not specially provided for.

At the trial of the case, George W. Soutar testified that he is a chemist employed by the exporter and that the processing of the soybean came under his direct supervision. He described the manner in which lecithin is produced, substantially as follows: First, the soybean is ground into small fragments or into flakes. Second, the ground material is placed in an extractor to remove the soybean oil. The material there comes into contact with a solvent known as "hexane" which dissolves the soybean oil from the flakes. As the result of such

treatment, soybean oil in a crude condition containing gums or sludge is produced, and the soybean flakes without the oil remain as a residue, at least so far as the merchandise in question is concerned. Third, the crude oil thus produced is placed in what is known as a heat exchanger, where the solvent "hexane" is removed for reuse. The oil remaining, containing large quantities of gums and sludge, is placed in storage tanks and water is added to aid in the separation of the wet gums from the oil. Thereafter, the oil is subjected to a mechanical centrifuge which further separates the wet gums and also the water from the oil, as these substances are heavier than the oil. The result of the centrifuge treatment is the clarified oil on one side of the machine and the wet gums and water on the other. Fourth, inasmuch as the wet gums would become rancid on account of the content of water, the material is conveyed to a vacuum drum drier where the water is reduced to about 2 per centum, deemed to be a quantity insufficient to prevent the successful storage of the material. This gum remaining is a crude phosphatide, known as crude lecithin. The refined soybean oil is thus prepared for use in the manufacture of edible oils, and the remaining crude lecithin is stored in steel drums ready for shipment to the ultimate consumer in the United States, and represents the product in question.

The witness further testified that prior to the year 1946 the exporter hired a truckman to take the wet gum or crude lecithin to the city dump in Toronto once a week. He also stated that, if the water were not driven off, the product could still be shipped to the United States but it would not keep so long. That is to say, if it were not processed quick enough it would become useless.

The chief chemist of the exporter, William E. Parker, testified for the plaintiff that the soybean contains lecithin as a natural constituent; that the term "lecithin" is used to denote a class or family name for a number of latent compounds found in plants and related compounds found in animal tissue; and that the term is also used for one specific chemical compound. He described the product taken from the soybean, to wit, the crude lecithin, as having no application to a pure compound, inasmuch as it is a mixture. The witness defined chemically pure lecithin as a glyceride in which one of the fatty acids has been substituted by a phosphoric acid radical esterified with an oleate. The witness further testified that the lecithin, the subject of the importation herein, was not to his knowledge ever used commercially in its imported condition.

Another witness, one L. R. Cook, the vice president of the ultimate consignee, the W. A. Cleary Corp., testified that he is a chemist; that the first step taken with the material after importation is to analyze it; that in his special studies of the soybean he found that

lecithin is naturally present therein, and that in its extraction neither the solvent hexane nor the water effected any chemical change, nor did the vacuum drying affect the nature of the material. The witness further testified that the material is not sold in the United States in its imported condition; that it is first filtered, then concentrated, and finally deodorized and decolored. For some purposes the material is bleached; that a further process is what he termed to be "milling." The final process, according to the witness, was one of standardization, that is to say, in order that the product become commercially valuable, percentages of certain ingredients must be maintained, depending on the industry using the product. The witness on cross-examination described the processes to which the merchandise was subjected upon arrival in this country in more detail. First, it is passed through a filter under high pressure in order to remove any meal or similar impurities including the waxes; that the separation of the meal and extraneous matter is a cleaning process, but the separation and removal of the waxes would not be so classed, although no chemicals are used. Secondly, the product is concentrated in order to increase the percentage of phosphatides. The deodorization is merely a process of aeration and gassing. The fourth step of decolorization is just a matter of washing with water and certain mild alkalies other than sodium hydroxide. The bleaching is accomplished with one of the peroxide chemicals such as hydrogen peroxide. The witness described the milling process as "a mechanical colloid" and a secret process which he did not care to divulge. As to the standardization, the witness stated that it was a matter of conducting the manufacturing processes so that a pound of finished refined lecithin will always produce the same results and perform to the same extent in the product in which the consumers use it. The witness further testified that all of the imported material has been subjected to those processes.

The assistant chief chemist of the Government laboratory making the official analysis testified for the Government that the imported material is a compound of a number of substances, that is to say, it contains the related phospholipids and other materials that come along with lecithin in an ordinary extraction process, plus any oil from the original material, and that it was not a chemically pure material. The witness testified further that the purpose of the analysis was to identify the product from a tariff standpoint and in that connection to determine the quantity of oil present in the lecithin. He described his method of determining the percentage of the contents of the substances in the materials, but admitted he did not analyze for the presence of waxes.

The witness described the experiment which resulted in the analysis as follows:

\* \* \* We took the sample and we determined the moisture. The first time we determined the moisture we did it by an A. O. A. C. method, which involved vacuum drying, or rather, drying on sand, and we found the moisture content to be 1.8 per cent. The second drying was conducted later, and we did that by the distillation method, with toluene, and the moisture in that was found to be 1.8 per cent also.

The next test that we did was the phosphorus. We determined the phosphorus in the material, and then calculated that phosphorus back to lecithin, using a factor of 26, which is practically the theoretical factor, and we arrived at a figure of 58½ per cent, or 57½ per cent, which we rounded off. The phosphorus content was 2.2 per cent.

We then ran the acid value on the sample, which consists of taking the oil into solution, or rather, the product into solution, and titrating it with alkali. We obtained an acid value of 15.4.

We then ran the saponification value, and we found that that was 198.2; the iodine value, 102.1. The iodine value of the acetone insoluble was 103.1.

We also ran an acetone insoluble at that time. That was a new test for us, but we found out from a reading in the literature that the acetone insoluble was a measure of the lecithin as it is sold, so we ran that.

Q. In other words, the acetone insoluble test is the test that is applied commercially, is that correct?—A. That is our understanding of it, yes.

Q. All right.—A. We found the acetone insoluble by the method which we used to be 48.3. However, we later, after we had made our report, which was based upon the phosphorus content, re-ran it by the American Oil Chemists' method, and we found the acetone soluble to be 35 per cent, and the acetone insoluble to be 63.1 per cent. We ran——

Q. And by acetone insoluble what do you mean?—A. The material which is insoluble in acetone at the time, when run by the method of the American Oil Chemists.

Q. Well, is that lecithin, in other words, this percentage of 63.1 per cent?—A. That is right.

Q. So that by this later method you found a lecithin content of 63.1 per cent, is that correct?—A. That is correct.

Q. And by this other method which you used in connection with the official report you found a lecithin content of 58 per cent?—A. That is right.

\* \* \* \* \* \* \*

Q. Mr. Eckweiler, I wanted to ask you this: Did you make any determination of the benzol insoluble in the material which is illustrated by Exhibit 1?—A. I did.

Q. And what percentage of benzol insoluble did you find?—A. One-tenth of one per cent.

Q. And will you state just what benzol insoluble means?—A. That would represent, in a product of this nature, the meal, and such other impurities as might not be soluble in benzene. (Record pages 47-49.)

The Government also called Joseph Eichberg to testify in its behalf. Mr. Eichberg testified that he holds a degree of Bachelor of Science in

commerce. After leaving college, he became associated with the American Mills Co. of Atlanta in sales work where he remained for about 4 years at which time the American Lecithin Corp. was formed, with the witness as vice president. The business of that company, according to the witness, was the development of the sale of lecithin in the United States and the importation of that commodity from Europe; that in the year 1935, the American Lecithin Co. was organized in conjunction with the sale of lechithin made in the United States. In such organization the witness has been its president since its inception. The witness stated that its business consists "in licensing manufacturers under patents relating to the manufacture of lecithin, and in conjunction with certain uses, in developing new uses for lecithin and selling lecithin products."

Although not a chemist, and apparently a sales executive, the witness testified he had become familiar with the chemical and physical properties of lecithin from observation in factories of the company licensees and in conversations with users. He described the patented processes used by the licensees, the substances in which lecithin originates and from which it has been obtained, and the uses of the material by various industries. Although not a chemist, nor with practical experience in the production of the salable product in the United States, the witness testified that a product containing 58 per centum lecithin, 42 per centum oil, and 0.1 per centum benzol insoluble would be commercially useful without further processing. He also testified upon tasting and smelling the sample of the imported merchandise, exhibit 1, that it appears to be commercial soybean lecithin and for some purposes neither its odor nor its taste was objectionable. He was of the opinion that it was not necessary to filter out a benzol insoluble content as low as 0.1 per centum, nor to refine the product represented by exhibit 1 in order to remove the oil. In his opinion, also, a lecithin content of 58 to 63.1 per centum would be acceptable to many purchasers.

Under cross-examination, the witness admitted that lecithin is produced by the company's licensees under specified patents covering secret processes. He was not able to state that the licensees followed the processes to the letter of the patents without also using additional processes. He also admitted that the aim of the processes employed by his licensees is to obtain a standardized product and that the material as it comes from the dryer is required to meet certain specifications among which are certain color standards and freedom from objectionable odors. The witness stated that his company tells the licensees "what we want, and we receive samples of practically every batch that they produce"; that commercial lecithin is ordered, either bleached or unbleached, as desired, and made according to the American

Lecithin Co.'s methods; that it must contain certain percentages of various constituents, to meet certain specifications; and that if the product does not meet such specifications, the company does not take it. The witness also testified that the company's standard as to the minimum acetone insoluble content and as to the benzol insoluble content varies with the grade, and the fats therein must be limited in an acceptable product.

The evidence adduced before the court discloses that the merchandise the subject of the importation in question is derived solely from the soybean. It further discloses that it is not lecithin *per se*. That is to say, it is not a lecithin containing impurities when taken from its native vegetable tissue which must be further refined before it becomes a usable product. On the other hand, it is a mixture resulting from the extraction of soybean oil from soybeans, which contains lecithin as one of the ingredients. Until 1946, this particular kind of residue was discarded as worthless. Upon the discovery that it contained phosphatide, known as lecithin, the moisture contained in the residue was removed in order that it would be longer preserved and in such state could be shipped without further disintegration. After reaching this country, it was prepared for use in various products. In the processing thereof, however, all the ingredients rendering the lecithin content impure were not removed in an endeavor to obtain a chemically pure lecithin. The amounts of the lecithin and other ingredients were merely stabilized at certain percentages required by various industries using the product so as to obtain a uniformity of performance. In some instances, the odor and color of the material were required to be changed.

It would seem clear from the evidence that the product in question is of vegetable origin. It is not, however, the native tissue merely separated from a vegetable substance, such as palm ribs stripped from the palm leaf, held classifiable as fibrous vegetable substances, not dressed or manufactured in any manner, by the appellate court in the case of *American Push Broom & Brush Co.* v. *United States*, 25 C. C. P. A. 248, T. D. 49391. Nor is it in the class of a manufactured by-product such as was the subject of the case of *United States* v. *Half Moon Manufacturing & Trading Co.*, 24 C. C. P. A. 232, T. D. 48668, where vegetable albumen, dried and ground, produced by drying and grinding gluten obtained by kneading wheat flour mixed with water, and washing out the starch, was held not to be a waste. The court was of the opinion that if it were a waste in its original condition after the removal of the starch, it was converted into a new article of commerce by the drying and grinding processes, and was in fact a manufactured byproduct.

It may be crude in that it has not been prepared for use in the various industries employing lecithin. Paragraph 1722 of the free list, under which the plaintiff claims, provides for vegetable substances, crude or unmanufactured, not specially provided for. The cases cited by the plaintiff are not in point. *United States* v. *Sheldon & Co.*, 2 Ct. Cust. Appls. 485, T. D. 32245, involved a gum resin in a crude state. It was derived from treating crude turpentine, being the residue after the turpentine was removed. The residue was cleansed, screened of insects and dirt, and then was ready for shipment. The court held that such treatment was merely getting the resin by itself and therefore it was "gum resin crude, not advanced in value," etc.

In *United States* v. *Danker & Marston*, 2 Ct. Cust. Appls. 522, T. D. 32251, the importation consisted of certain gum tragasol. It was assessed as a nonenumerated manufactured article. The article was claimed to be free of duty as articles in a crude state used in dyeing or tanning, not specially provided for. Tragasol is a gum extracted by patented processes from the locust bean. The Government contended that the gum was not in a crude state and that if not dutiable as assessed it was dutiable as a vegetable extract used in dyeing. The court found that the gum tragasol was not a dyeing agent itself but was used as a carrier of dyes. Therefore, it was not dutiable as an extract used in dyeing. The court found, however, that it was in a crude state inasmuch as it required considerable treatment before being ready for use as a carrier of dyes. It may be noted that no claim was made that the gum tragasol was free of duty as a vegetable substance, crude or unmanufactured, under the tariff act there in question.

In the case of *United States* v. *United States Rubber Co.*, 31 C. C. P. A. 174, C. A. D. 269, cited by the plaintiff, the importation consisted of crude gutta-percha which was obtained from the leaves of the gutta-percha tree but in order to free it from all dirt and vegetable matter it was dissolved in gasoline and run through a filter cloth. Then the liquid was cooled and the gutta-percha separated in the form of flakes. After a few other processes, the flakes were formed into hard blocks of white gutta-percha. The court held that the gutta-percha there in question was still in a crude state, as to hold otherwise would prevent a holding that any gutta-percha free from dirt is crude gutta-percha. All processes applied to the gutta-percha containing dirt and vegetable matter were merely for the purpose of producing such a crude article. The issue here, even though it was admitted the importation was in a crude state, is whether it is a vegetable substance, not specially provided for. The plaintiff admits that the lecithin material imported is not a vegetable itself, but a component of a vegetable. The case of *United States* v. *Rice Co. et al.*,

9 Ct. Cust. Appls. 165, T. D. 37998, cited by the plaintiff, is not in point inasmuch as the court's holding that bleached wheat stems and heads were free of vegetable substances, crude, pertained to the vegetable substances rather than components thereof.

However, from the evidence produced, the court is of the opinion that the importation should have been classified as a waste, not specially provided for. It is a residue and final left-over product in the process of refining soybean oil. Also, it is a refuse material not susceptible of being used for the ordinary purposes of manufacture without being standardized as to the quantity of lecithin therein, the quantity of oil, or the moisture and meal contained therein. The court is not unmindful of the testimony of Government witness Eichberg, president of the American Lecithin Co. He was not a chemist nor a manufacturer of lecithin. He did not produce any samples of the product of manufacturers operating under patents issued by his company in order that a comparison could be made as to color, odor, taste, etc. In making purchases from his licensee manufacturers, he admitted that the product must contain certain percentages of the various constituents and meet certain specifications in order to be accepted. His opinion that the imported product could be used in industries in the United States without further processing is merely an opinion of an unqualified witness without basis of fact. No weight should be accorded such opinion evidence, particularly in view of the uncontradicted testimony of the importer's witnesses that the merchandise was further processed through standardization methods and that a sale had not been found for the imported product in the state in which it reached this country.

The Government contends that the term "waste" does not apply to merchandise which is a sought after byproduct. The case of *American Smelting & Refining Co.* v. *United States*, 12 Ct. Cust. Appls. 212, T. D. 40226, involving an importation of arsenical flue dust, as relied upon by the Government, is not in point because it was shown to have been produced by means of special and even elaborate manufacturing processes for its own value as a separate article of commerce, and obviously partly manufactured. The case of *United States* v. *Half Moon Manufacturing & Trading Co.*, *supra*, also cited by the Government, is not in point as previously stated. Here, soybeans were processed to obtain soybean oil. The crude oil still containing the merchandise in question was separated from the remaining vegetable matter. When the crude oil was refined, the remainder constituted the material in question, except that it contained large quantities of water. This water content was reduced to about 2 per centum, making it more susceptible to successful shipment by enhancing its storage qualities. The fact that the excessive moisture

was removed in order that it could be preserved for shipment would not of itself remove it from the category of a waste.

The plaintiff contends that the lecithin in question is one of the wastes from the processing of soybeans into refined soybean oil. Counsel cites the case of *Cia. Algodonera* v. *United States*, 23 C. C. P. A. 42, T. D. 47686, involving an importation of cottonseed hulls produced as a byproduct in the manufacture of cottonseed oil and meal, and not further manufactured, used for cattle feed, which the court held dutiable as a waste, not specially provided for, and not a vegetable substance, crude or unmanufactured, not specially provided for. The court stated:

* * * The cottonseed hulls are a by-product of the oil mills, necessarily produced in such oil mill operations. The fact that they are a valuable product, and are a distinct commercial entity, does not militate against the view that they are, in a tariff sense, waste.

Also cited is the case of *United States* v. *George J. Tarr Co.*, 16 Ct. Cust. Appls. 404, T. D. 43121, wherein the residue left after extracting cod-liver oil from cod livers was held to be a waste.

In *W. A. Cleary Corp.* v. *United States*, Abstract 51524, an importation of lecithin was held dutiable as assessed by the collector. There, however, no evidence was produced to show the process of manufacture. The importation was described as consisting of lecithin in a soybean carrier to which it was tightly bound, which also contained a quantity of free oil and soybean meal. In the case before us, however, the deficiency in evidence has been supplied. For the reasons stated, it is the opinion of the court that the merchandise as imported falls directly within the provisions of paragraph 1555, as amended by T. D. 49753, as waste, not specially provided for, at the rate of 7½ per centum ad valorem.

Judgment will therefore be entered in favor of the plaintiff directing the collector to reliquidate the entry and make refund of duties in accordance with law.