(C. D. 1357)

WERNER G. SMITH CO. DIV. ARCHER DANIELS MIDLAND CO. *v.* UNITED STATES

## United States Customs Court, Third Division

(Decided August 6, 1951)

*Eugene R. Pickrell* (*Eugene R. Pickrell* and *Michael Stramiello, Jr.*, of counsel) ; *Oscar Bland,* associate counsel, for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Joseph F. Donohue,* special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

JOHNSON, Judge: The merchandise involved in this action consists of an importation of tall oil, invoiced as liquid rosin. It was assessed for duty at the rate of 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930 as a nonenumerated manufactured article. The plaintiff claims that the merchandise is classifiable as a waste, not specially provided for, at the rate of 7½ per centum ad valorem under the provisions of paragraph 1555 of the Tariff Act of 1930, as modified by the trade agreements with the United Kingdom and with Mexico, published as T. D. 49753 and T. D. 50797, respectively; or at the rate of 10 per centum ad valorem as a nonenumerated unmanufactured article under the provisions of paragraph 1558; or as rosin under paragraph 90, as amended by the trade agreement with Mexico, T. D. 50797, at the rate of 2½ per centum ad valorem; or that it is free of duty under the provision for natural gums, natural gum resins, and natural resins, as provided in paragraph 1686 of the Tariff Act of 1930. The claims principally relied upon by the plaintiff are that the merchandise is dutiable either as a waste, not specially provided for, or as a nonenumerated unmanufactured article.

The plaintiff produced three witnesses, James T. Akehurst, the general superintendent of the plaintiff; Carl M. Thorsen, a chemical engineer and general superintendent of the Camp Manufacturing Co. of Franklin, Va., who was formerly employed in the paper mills of the "Korsnas Sagverks Aktiebolag" at Gavle, Sweden, the shipper of the instant merchandise; and C. Olof Gabrielson, a chemical engineer in charge of organic chemical research for "Mo och Domsjo A. B." in Sweden.

The Government produced four witnesses, Helen Garbutt, a chemist employed by the Government in the appraiser's stores laboratory, who analyzed the merchandise; Herbert W. Eckweiler, the assistant chief chemist in the New York Customs Laboratory; Jerome L. Boyer, in charge of the technical sales service of Newport Industries, Inc.; and Arthur Pollak, a self-employed consultant in the field of pulp and paper products, holding the degree of Doctor of Philosophy in chemical engineering, and builder of a "pilot plant for tall oil about

1930," who had made a considerable investigation relative to the economics and utilization of tall oil in the United States, and is a publisher of several treatises upon the subject of tall oil.

Mr. Akehurst supervised the analysis of fatty acid oils for 17 years. He was familiar with the importation in question, had seen it in storage, had used it for processing, and had also supervised the analysis of it. Such analysis indicated to him that the merchandise was crude tall oil from Sweden. He produced a sample of the imported merchandise, which was admitted in evidence as exhibit 1. He also produced descriptions of the various methods which may be employed in the analysis of merchandise similar to that at bar, received in evidence as plaintiff's collective exhibit 2.

The witness testified that there was a difference between crude tall oil and refined tall oil, the refined oil being lighter in color and having a lower rosin acid content and a higher fatty acid content than the crude. A sample of the refined tall oil was marked in evidence as illustrative exhibit A.

Mr. Thorsen testified that the terms "liquid rosin" and "crude tall oil" were synonymous; that the word "tall" in the Swedish language is translated "pine." In the Camp Manufacturing Co., the witness testified he supervises the production of crude and refined tall oils; and that in all the mills he had observed in Sweden producing tall oil, he saw the tall oil produced in the same manner as in the United States. The witness described the method of production substantially as follows:

The process starts with a stick of wood. The bark is removed. It is chipped into wooden splinters. These splinters are placed in a digester where they are treated with sodium hydrate and sodium sulphide under a temperature up to 170° C. from 2 to 7 hours. The contents of the digester are then blown into a receptacle. There, the resultant black liquor is separated from the fiber. The object of that operation is to obtain wood pulp. The fiber is washed with hot water and the resultant liquor is stored in tanks for further processing. In these storage tanks, there is a separation of the fatty and abietic acids which were present in the wood. These liquors are concentrated in a steam-heated evaporator. The fatty acid soaps are skimmed off. These skimmings are the soda salts of the fatty and rosin acids in the wood. The skimmings are allowed to settle in a tank. Thereafter, sulphuric acid is added to them.

After acidulating the skimmings, the tall oil is separated from the remaining product by a flotation method which the witness described as follows:

After the process has been finished to the completion the thing is left to stand in quiet, tall oil floats to the top, and the resultant sodium fades underneath. The acidulation is done in a tank and the separation is done in the same tank. It

stands about 3 or 4 hours. Then the normal procedure is to run off the liquid until you came to a certain level, and there you have to draw off a space, and you draw your tall oil off at that space, and leave the rest of it in the tank.

The result of the acid treatment is to convert the soaps to the original fatty acids. These fatty acids are "unsaturated fatty acids, principally linoleic, linolenic and oleic." In the opinion of the witness, the fatty acids, the rosin acids, and the unsaponifiable matter in exhibit 1 are the same materials as are found in the pine trees in Sweden.

Defendant's exhibit 3 consists of a pamphlet containing an analysis of the constants and compositions of various fats and oils which the witness testified were sold by his company and that said pamphlet was used by the employees of the company and disseminated in the trade.

The witness also testified that exhibit 4 contains an authoritative description of tall oil by persons in the wood pulp industry, and he also agreed with that definition, which is as follows:

Tall Oil.—The natural mixture of rosin acids related to abietic acid, and of fatty acids related to oleic acid, together with nonacidic bodies, which is obtained by acidifying the black liquor skimmings of the alkaline paper pulp industry.

On cross-examination, the witness further testified that in the making of pulp, paper is the primary article to be obtained; that turpentine is obtained in the production of wood pulp by condensing the gas and steam that is drawn off at the top of the digester during the cooking; that the turpentine is separated and then it is purified; that the cooking procedure is undertaken in order to separate the cellulose fibers from the other material; that turpentine is obtained as a byproduct, and in the same way rosin is obtained as an incidental product, that is, a parallel product; that after producing the wood fibers, the rosin and the turpentine, there remains the black liquor, which is further concentrated; that the concentration is for the purpose of obtaining as many of the chemicals as possible; that, after the black liquor has been concentrated and put in the storage tank, the soaps float to the top and are skimmed off, and the black liquor thus prepared is sent back to the evaporator for further concentration before burning; and that what remains is called skimmings. These skimmings are a waste product which formerly was burned in the United States:

X Q. Now, after the treatment with sulphuric acid the article that results is not a wasted product, is it?—A. It has a sale.

X Q. That is tall oil, is it not?—A. That is right.

X Q. Now, by that process of treating skimmings with sulphuric acid these wasted skimmings are converted into this salable tall oil, isn't that true?—A. Correct.

The witness further testified that this treatment of skimmings with sulphuric acid was an isolation and a reconversion; that the

process results in a mixture of rosin acids and fatty acids; that this combination of acids is very closely related to abietic acid; that rosin acid is not as specific as abietic acid—rosin acids describe a variety of possibilities, while abietic acid is one individual; and that abietic acid is one of these acids which is found naturally in the tree.

The witness agreed with the following definition:

Skimmings (Tall Oil).—The curd, not acidified or otherwise processed, skimmed from the black liquor of the alkaline paper pulp industry, from which tall oil is obtained.

The witness described the so-called isolation or reconversion as follows:

X Q. Tell me, please, the manner in which the reconversion takes place.—A. Initially these materials are found as an acid. When treated with alkali they get converted to soaps, and when acidified they reconvert to acids.

The witness explained the first treatment with alkali as the treatment of the wood chips in the making of wood pulp paper, and that the end product there, so far as pulp making is concerned, is the skimmings. The witness testified that the material known as skimmings is one of the products used in the making of tall oil, and the other is sulphuric acid.

X Q. And that process is the process by which you reconvert the skimmings to the acid combination known as tall oil, isn't that correct?—A. That is correct.

Mr. Gabrielson agreed with the definition of tall oil as expressed in exhibit 4. He testified that tall oil can be separated into its various constituents, mainly fatty acids and resin acids; that usually the main product containing fatty acids also contains about 30 per centum of resin acids when it is sold; that the method of obtaining the crude tall oil is "an isolation process"; and that tall oil is the essential part of the end product, and is the same as found in the wood in the form of fatty and rosin acid material.

The witness further testified that he had never heard of skimmings being sold in Sweden. As far as he knew they were burned. When this witness was asked if the terms "liquid rosin" and "tall oil" were synonymous from a scientific standpoint, the witness answered:

I would not; in fact, I regard the term "liquid rosin" as obsolete nowadays from a technical and from a chemical point of view, but it has been used for very many years as a term referring to this product we are discussing here, and so far as I know is still being used for commercial purposes.

According to the witness, the terms are not interchangeable from a scientific point of view, but they are from a commercial point of view; tall oil is not a form of rosin; and the term does not describe the material very well from a scientific view.

In writing the formula, representing the chemical reaction taking place when skimmings are mixed with sulphuric acid, admitted in

evidence as exhibit 5, the witness described it as a part of the process but stated that "it is certainly not the whole process, and I am not convinced that everything is known about that process yet"; that the skimmings represent "sodium salts of fatty and resin acids," but there are other things in the skimmings which are not yet known, the witness stating: "There are some materials that you don't know what there is in the skimmings." He further testified as to the chemical reactions taking place, as follows:

X Q. Now, are there other materials that are known that you know of you haven't written here?—A. Why surely, very many.

X Q. Natural components of the skimmings?—A. Natural components of the wood and of the skimmings, and that also go into the tall.

X Q. And are they affected by this chemical reaction?—A. I don't know.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Well, then your testimony is that you are just not informed on every reaction that takes place when skimmings are treated with sulphuric acid, is that true?—A. That is true.

The witness reiterated his conviction, however, that in obtaining this tall oil the fatty acids and rosin acids contained therein are found naturally in the tree.

Miss Garbutt testified on behalf of the Government that she determined the rosin acid, fatty acids, and unsaponifiable material, finding the percentages of each. By the usual customs method, she found that the rosin acids were 36.9 percent, the fatty acids 45.6 percent, and the unsaponifiable matter by difference was 17.5 percent. Using the method recommended by the American Society for Testing Materials, she found the rosin acids to be 33 percent; the unsaponifiable matter 11.6 percent; and the fatty acids, by difference, were 54.9 percent, plus a half percent moisture. The witness was of the opinion that the two analyses fell within the range given in the literature for crude tall oil and that there was no significant difference, although she admitted the second analysis would perhaps be more acceptable than the first. By means of the analyses performed, she recognized the merchandise to be crude tall oil.

Mr. Eckweiler testified that he would identify skimmings as a crude soap obtained in the manufacture of the paper pulp. But he would not identify tall oil as represented by exhibit 1 as any of the forms of rosin nor would he identify it as a form of rosin oil.

When asked what chemical reaction takes place when the skimmings are treated with sulphuric acid, the witness replied:

The sodium in the soaps is replaced by the hydrogen in the acid, sulphuric acid that was added. There are formed then the free fatty and resin acids which were present originally combined with sodium and sodium sulphide. That is in essence the reaction that takes place there.

As to the various forms of the acids as occurring in and out of the tree, the witness testified substantially as follows:

The occurrence of the fatty acids in the pine tree is in a combined form and in a free form. When in a combined form, they are combined as esters. There is evidence that they are combined with alcohol such as glycerine. In other words, they are present as fats to a large extent. There also is evidence that they are present, combined with the sterols, for example, viosterol is combined with fatty acids. The resin acids present in the wood itself are not very stable resin acids. It is known that they come out of the wood by excision, that is, injuring the wood so that the sap comes out, that would give you oleoresin; turpentine, in the case of a pine tree. It is also known that the resin acids, as they are secreted are entirely different from the ones that are found in the finished rosin. They are so sensitive to heat and chemicals and oxygen of the air that they change rather readily, having a tendency to isomerize and to polymerize, and as such, of course, they have been put through a rather rigorous chemical treatment in the preparation of the black liquor, and it is very doubtful that they are, in the final product, in the same state that they were in the wood. Therefore, he concluded that the fatty acids and resin acids, as found in the merchandise in question, were not the same. That is, they were not in the same form as such acids existed in the wood. Also, the fatty acids and the rosin acids found in the tall oil are not found in the same form in the skimmings for the reason that the sulphuric acid removes the sodium, which has been combined with the fatty acid and resin acids in the form of skimmings, and replaces it with a hydrogen.

The witness admitted on cross-examination that there are free resin acids in pine trees, but insisted it was not true that there are more free fatty acids in the pine tree than there are fatty acids combined with glycerine to form esters. Also, the witness was of the opinion that abietic acid does not exist as such in any quantity in the pine tree. Nor would he agree that the definition of "abietic acid, sylvic acid," given in the Hackh's Chemical Dictionary, was an acid from the resin of pine species. Although the witness found that extracts obtained by the use of ether are made from the pine wood of the resin acids and the fatty acids, he also found that in a comparison of the chemical and physical characteristics of those ether extracts with the crude tall oil, they were not very similar. The witness further testified that the hydrogen atoms in the crude tall oil are different from the hydrogen atoms in the fatty acids in the tree. Although he was unable to identify the source of those hydrogen atoms, he was positive that "the fatty acids now have a hydrogen atom which came from the sulphuric acid or the water which was present at the time of the neutralization," and that it was not the

same hydrogen atom that existed in the fatty acid originally in the tree. The witness further testified as to the hydrogen atoms as follows:

X Q. Isn't that only theoretical? You can't identify the hydrogen atom, can you?—A. I don't intend to. I don't have to identify it because the reactions that have taken place first remove the hydrogen atom, change it into a water, combined it to form water in the original reaction, with sodium hydroxide. Water was in the black liquor, and there are large amounts of other water added there, and as the thing went on through the process the skimmings came up, they were separated so they had a small percentage of water as compared to the entire black liquor.

X Q. Mr. Eckweiler, isn't it true that hydrogen atoms or ions were freed from the resin acids and the fatty acids in the wood pulping?—A. They were.

X Q. Isn't it true that probably these hydrogen atoms also went along in the soap skimmings?—A. No, soap skimmings don't contain those hydrogen atoms.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. But you don't wish to testify it is impossible for any of those hydrogen atoms or ions that came from the acids in the tree not to be in the soap skimmings?—A. I couldn't testify it was impossible at all, but I testify that it is very improbable.

X Q. Not impossible, right? All right. If they are in there then when you treat it with sulphuric acid isn't it very possible that they will also combine again with these acid radicals?—A. No, it is not possible. That is something that is out of the realm of possibility.

X Q. You consider it absolutely impossible?—A. I would, yes.

The witness testified further that there are a number of types of hydrogen today, such as deuterium, and some of the isotopes; that different isotopes are obtained from different concentrations in different waters of the world; and that although the difference is very small in such isotopes, there is a difference, and also there is a difference in hydrogen atoms. For example, heavy water is distinguished by the hydrogen atom rather than the oxygen. The hydrogen therein is an isotope having a higher weight than the ordinary hydrogen atom.

The witness further testified that the fatty acids in exhibit 1 contain linoleic acid, linolenic acid, and a small amount of stearic acid, and probably other acids of greater molecular weight than any of those known to be present, and that oleic and linoleic acids were two of the principal acids present. The witness wrote a formula, admitted in evidence as exhibit 7, putting a circle in pencil around the fatty acid radical—the hydrogen for the acid—and also around the hydrogen ion in this fatty acid. In summing up his testimony, the witness stated that in the wood chips there is no free fatty acid occurring in the ester and only a portion of the acids present therein is in the free state, whereas in the crude tall oil, the acids present are essentially in the free state.

Mr. Boyer, in charge of the technical sales service, testified that his company purchases both skimmings and the crude tall oil, refines the tall oil, and sells it. The skimmings purchased by his company are from the process of manufacturing pulp paper, and its purchase of skimmings "would run about 5 or 6 tank cars, that is, 8 or 10,000 tank cars a month." From the skimmings so purchased, crude tall oil is recovered and then refined.

Dr. Pollak testified that he first began working with tall oil about 1928 and has been active in that field ever since that time. He built a pilot plant for the production of tall oil in 1930 and conducted considerable investigations regarding its economics and utilization. He studied the production of tall oil in Sweden and analyzed samples of shipments of tall oil sold in the market as Swedish tall oil, and, as compared with domestic tall oil, there is very little difference between the physical or chemical properties.

The witness further testified that skimmings, pulp, and turpentine are the three products produced by the operation. He has bought and sold tall oil in commercial quantities since about 1930, and the skimmings since 1940. Skimmings are usually purchased for further processing and manufacturing into tall oil. Skimmings are incapable of use in the place of tall oil, the latter having much more extensive uses. Also, skimmings and tall oil cannot be used in the same manner or for the same use because the former is an aqueous paste containing principally the sodium compounds of fatty and rosin acids, plus water, and appreciable quantities of occluded black liquor, while the latter is a dark brown oil in crude form, which is a mixture of fatty and rosin acids. The witness also testified that the mixture of fatty acids and rosin acids in tall oil is not present in that form in the skimmings, and that the natural products in the wood are transformed by chemical reactions to the materials known as tall oil.

Counsel for the plaintiff contends that the evidence establishes that the mixture of rosin acids, fatty acids, and unsaponifiable matter is found naturally in pine trees and is obtained by isolation of the ingredients from the pine trees. It is further contended that the fatty acids and rosin acids are physically present in the wood and the process used to obtain them was one of physically separating them from the wood and the skimmings. Therefore, the resultant product was obtained by physical isolation and not by chemical disintegration; that these acids are substantially of the same chemical composition as when they were in the trees. Great reliance by the plaintiff in making such claims is placed in Dr. Pollak's description of tall oil as—

The *natural mixture* of rosin acids related to abietic acid and of fatty acids related to oleic acid, together with nonacidic bodies, which is obtained by acidifying the black liquor skimmings of the alkaline paper industry. (Record, p. 157.) [Italics not quoted.]

Plaintiff also refers to Dr. Pollak's article, exhibit 12, as an authority in the development of the processes whereby "the fatty and rosin acids *occurring in trees* are recovered," and to Dr. Pollak's testimony that he agreed with the statement in exhibit 13 that: "Remember *nature* made only one mixture of fatty and rosin acids—namely Tall Oil." [Italics not quoted.]

The plaintiff further contends that the imported product is a waste obtained in the production of wood pulp from pine trees, for the reason that it has been established to be undesirable in the production of wood pulp, inasmuch as the fatty acids readily precipitate and make spots on paper, and that the skimmings were originally an unwanted residue which formerly had been burned in Sweden and such skimmings had never been sold in that country of production.

It is further contended that the imported product is an unmanufactured article because the evidence conclusively establishes that it contains certain ingredients natural to pine trees and is obtained therefrom by an isolation of these ingredients; that the fatty acids, rosin acids, and unsaponifiable matter are the same as are found in pine trees in Sweden; that the only change taking place is a separation from the natural, native setting; and that the method of separation, whether physical or chemical, is immaterial so long as the imported merchandise *per se* is unaltered.

Counsel for the Government, on the other hand, contends that skimmings are the raw material, and that tall oil is manufactured therefrom by the addition of sulphuric acid, thus causing a chemical reaction whereby resin acids and fatty acids were liberated, and that the record evidence establishes that the product known as skimmings is the commercial article. Government counsel points out that three products are the result of digesting wood, steam, and sodium hydroxide, to wit, the paper pulp, sulphite turpentine, and skimmings. It is argued that from the skimmings, tall oil is produced, leaving a sodium sulfate liquor, which is returned to the furnaces, and a black liquor, 25 per centum solids, which is returned to the evaporator, and from which chemicals of value are recovered. Therefore, contends Government counsel, the tall oil is a separate commercial entity with properties, values, and uses distinguishing it from paper pulp, in which event it cannot be regarded as a waste.

Regarding crude tall oil being properly classified as a nonenumerated unmanufactured article, counsel for the Government points out that the evidence establishes that tall oil of itself is not naturally present in pine trees. Although admitting that the principal ingredients of tall oil are natural constituents of pine wood, Government counsel stresses that the cellulose matter, which is the principal ingredient in the manufacture of paper pulp, is also one of the natural constituents of pine wood. This tall oil is not one of the end products

in the manufacture of wood pulp, for the reason that it does not come into being until the wood swimmings in the paper pulp process have been treated with chemicals which impart to that end product the characteristic properties of tall oil. It is contended that such process is clearly a manufacturing operation.

Counsel for the plaintiff cites and relies upon the case of *Baird & McGuire, Inc.* v. *United States*, 64 Treas. Dec. 255, T. D. 46638, which also involved liquid rosin. There, it was found to be a mixture of rosin, rosin oil, and fatty acids, which was a thick heavy liquid, a residual material from the manufacture of paper. Upon a record not as complete and thoroughly tried as the case at bar, the court held the product to be a waste. No appeal was taken by the Government in that case.

Counsel for the plaintiff also cites *Willits & Co.* v. *United States*, 11 Ct. Cust. Appls. 499, T. D. 39657, involving the classification of certain cracklings, which were described therein as "a final residuum remaining after all of the valuable elements for packing purposes have been extracted from it," and compares the imported material herein as similar in many respects to beef cracklings, in that it is a refuse left over in the production of wood pulp, is the final residuum remaining after obtaining the wood pulp from the pine trees, and is not an article which is sought or purposely produced as a byproduct, but to the contrary, it is reduced in quantity to the lowest possible minimum as an unsought residuum. The comparison of the cracklings to the case at bar would have been more apropos were it not for the fact that the production of wood pulp was complete after the washing out of the skimmings and black liquor. Processes thereafter had no connection with the production of the wood pulp but dealt particularly with the production of crude tall oil. Therefore, the *Willits* case is not in point here.

In an effort to establish that the merchandise is unmanufactured, counsel for the plaintiff likens the liquid rosin herein to the merchandise the subject of decision in *Hampton, Jr., & Co.* v. *United States*, 6 Ct. Cust. Appls. 392, T. D. 35926, where molybdenite, a mineral substance, was freed from the rock or gangue formation in which it was found by crushing the rock without crushing or changing the mineral itself. There, the court stated:

\* \* \* It may be generally said that it has been uniformly held in customs interpretation that the application of processes necessary to produce an article from its native condition and to bring it into a condition that it may be imported, without affecting its *per se* character, is not regarded either as a manufacturing process or as a process advancing it in value or condition.

The process in the case at bar was undertaken in order to produce wood pulp. The end product, or one of the end products, was skimmings. These skimmings, it is admitted, did not contain anything

that could be found in the native tree. A reconversion of such end product was necessary to even obtain a product related to the natural contents of the tree. Therefore, the *Hampton* case, *supra*, is not applicable.

The plaintiff also cites *Biersdorf & Co., Inc.* v. *United States*, 69 Treas. Dec. 986, T. D. 48353, where gutta-percha resin was extracted from gutta-percha by the use of kerosene, and held to be a natural resin; and the case of *C. J. Tower & Sons* v. *United States*, 24 Cust. Ct. 152, C. D. 1224, where a dried gum contained in soybean oil extracted from soybeans was separated therefrom and held to be a waste. There, however, the gum was physically, as differentiated from chemically, present within the soybean, and the oil and the gum were physically present in the crude soybean oil. The gum was isolated from the crude soybean oil merely by a mechanical centrifuge process. There, it was held to be an isolation process rather than a manufacturing process. The facts in the case before us as heretofore set out are clearly distinguished from the facts in the *Tower* case, and that applies also to the *Biersdorf* case, *supra*.

Counsel for the Government cites many cases sustaining the classification of the collector including *American Smelting & Refining Co.* v. *United States*, 12 Ct. Cust. Appls. 212, T. D. 40226; *Chicago Mica Co. et al.* v. *United States*, 21 C. C. P. A. 401, T. D. 46927; and *United States* v. *Half Moon Manufacturing & Trading Co.*, 24 C. C. P. A. 232, T. D. 48668.

The question before the court in this case is whether or not there was labor performed upon the end product in the production of wood pulp which would remove it from the characterization of waste, and whether such end product was the imported article in this case, or whether or not the imported merchandise was a raw or unmanufactured article, in that regard, it being contended that the imported material was a product natural to the pine tree and that the separation therefrom was merely a method of isolation.

From a careful consideration of the testimony before the court, we are of opinion that the imported product is not a waste from the production of wood pulp. A similar case arose in *Wilson Martin Co.* v. *United States*, 73 Treas. Dec. 179, T. D. 49386. The importation consisted of an acidulated cotton seed soap stock, commonly called black grease. It was derived from soap stock residue resulting from the refining of cottonseed oil. In order to obtain an edible cottonseed oil, the raw material is subjected to treatment with a dilute alkali that reacts upon the free fatty acids. Thereby, a so-called "soap" is created which separates from the mass and carries along with it certain albuminous and mucilaginous matters, including certain lyes which hold the moisture in the product. These "soaps"

are allowed to settle and are run off into a soap pan, and such material constitutes the residue after the removal of the edible oil. This residue soap stock is only about half way along the process toward the production of the acidulated soap stock, the subject of that importation. First, it was treated with concentrates of sulphuric acid. After such treatment, a black mass floats on top of the tanks and then the watery material remaining was drained off the bottom and discarded. This black mass constituted the acidulated soap stock. The court stated:

> The merchandise at bar cannot be said to have been reduced to the lowest possible minimum as an unsought residuum. It seems to be an article purposely produced as a byproduct. Certainly it has been processed after reaching the state of a waste in the refining of cottonseed oil. A partial refining of the waste was undertaken before shipment, and there is nothing in the record to show that the merchandise was not advanced toward the final product for which it was intended. It surely cannot be regarded as the same product as the cottonseed soap stock. It is different in texture, in color, and in name. Although it may not have attained a new use, it has a new character, as the alkalies have been eliminated together with other waste materials. Likewise, it is not a raw or unmanufactured article. It is a byproduct in the refining of cottonseed oil, which has been refined to some extent.

In the case of *Meyers & Co.* v. *United States*, 10 Ct. Cust. Appls. 216, T. D. 38557, the merchandise consisted of a dark, heavy liquid, imported from Canada in tank cars. It was invoiced as "Lignum extract," a byproduct from the manufacture of sulphite wood pulp. The collector assessed the merchandise for duty as a waste, not specially provided for, and it was claimed free of duty under a provision for extracts of oak and chestnut and other barks and woods other than dyewoods such as are commonly used for tanning. The court described the process resulting in the product there imported as follows:

> * * * Spruce and balsam logs are barked, and then reduced to small chips; these are placed in large digesters, and are cooked in liquid calcium bisulphide, an acid; the contents are then forced into a blow pit with a perforated bottom, through which the liquid drains out, leaving the wood pulp in the pit; the liquid thus recovered is conducted to a large storage tank, where certain foreign matters are precipitated; it is then transferred to an evaporation plant, where by means of steam introduced under a vacuum about nine-tenths of the water in the liquid is driven off and various chemical elements are greatly reduced, leaving the material but slightly acid. This final product constitutes the present importation, which, as before stated, is transported into this country in tank cars.

The court in commenting upon the method of production of the commodity there imported stated that "It appears without dispute that the imported liquid was first produced as a waste resulting from the manufacture of sulphite wood pulp, and that it was subsequently processed to bring it to its present condition." The court found the

merchandise to be an extract of the spruce and balsam woods and classifiable as extracts of other woods such as are commonly used for tanning as claimed.

In *Standard Oil Co. of Louisiana* v. *United States*, 6 Cust. Ct. 237, C. D. 471, involving certain waste gases, the court stated that there are two classes of waste products; one, a material which is a final residuum remaining after all the valuable products have been removed therefrom, and the other, scraps and broken pieces of the original material, such as was the subject of the case of *Latimer* v. *United States*, 223 U. S. 501, in reference to which the Supreme Court defined "waste" as referring—

* * * to remnants and by-products of small value that have not the quality or utility either of the finished product or of the raw material.

The court, however, found that the waste gases did not respond to such definition because the product had neither the characteristics of the material placed in bonded warehouses nor the final products sought, as it was a refuse which was left over and not susceptible of use either as an oil or as a gasoline, and responded to the definition of "the final residuum remaining after all the valuable elements have been extracted" and was not "an article which is sought or purposely produced as a byproduct in the industry." The court therefore held the waste gases to be classifiable as a waste.

In the case of *A. J. Murray & Co.* v. *United States*, 7 Cust. Ct. 160, C. D. 560, the merchandise at issue consisted of certain fatty acids derived from linseed oil. It was claimed that the material was a raw or unmanufactured article, or a waste, rather than a nonenumerated manufactured article. The evidence disclosed that the components of crude linseed oil were glycerin, linseed fatty acids, and minor amounts of protein with some water; that linseed oil occurs in nature in ripened flaxseed; and that in the immature seed glycerin is first formed and then the fatty acids, and after extraction from the ripened flaxseed, the raw linseed oil consists of fatty acid radicals and glycerol radicals. The separation of the fatty acids from the linseed oil was effected by what is known as the Twitchell method, consisting of a saponification process, whereby a soap or fatty acid and glycerin is formed as the result of the reaction of an oil with either water or any alkali. There, also, it was contended that the fatty acids in question consisted of a material appearing in nature and that the processes undertaken were merely necessary to isolate the natural product and that such processes are not to be considered manufacturing operations. There, it was argued that the free fatty acids could have been separated from their native habitat and such separation would not have constituted a process of manufacture. The Government contended that the fatty acids were produced by means of a chemical reaction

whereby linseed oil was changed into two entirely new and different products, one of which was the subject of importation.

The court considered the question of whether or not the operation, applied to the linseed oil in order to free the fatty acids, which admittedly existed in the flaxseed in the free state, was to be regarded as a manufacturing process. In deciding that the fatty acids there in question were not in a raw or unmanufactured state, the court stated:

* * * Inasmuch as the native state of linseed oil in the seed is neither free fatty acids nor glycerin, and a subsequent processing of an article is necessary in order to transform its constituents to a state in which they appear at one period in the natural flaxseed, the rule, as announced by the courts of not regarding processes of separation as manufacturing operations, in our opinion, would be unduly enlarged were it held to include such processes as were here applied to linseed oil.

In the case of *United States* v. *Half Moon Manufacturing & Trading Co.*, 24 C. C. P. A. 232, T. D. 48668, the merchandise as imported consisted of certain vegetable albumen, and was in fact gluten. The evidence disclosed that the manufacturer was interested in the manufacture of starch which was native to wheat. The basic material was wheat flour. The process of obtaining the starch was accomplished by merely mixing the flour with water, kneading, and washing out the starch. The residue was dried in order to prevent fermentation and then ground so as to prevent undue absorption of moisture and to facilitate packing for transportation purposes. The court held that the process of obtaining the gluten was a manufacturing operation.

If gluten, a native constituent of wheat, is to be properly regarded as a manufactured article rather than a waste or a raw or unmanufactured article upon mere separation of wheat flour into its two constituents of wheat starch and wheat gluten, by means of washing with water, without chemical reaction of an sort, in the opinion of the court, a reproduction of fatty acids, native to the pine tree, brought about through the reaction of chemicals, even though the identical fatty acids were established to have been present in the pine wood before being converted into wood pulp, would not be regarded as a raw or unmanufactured article, nor a waste.

In *McLaughlin & Freeman* v. *United States*, 16 Cust. Ct. 186, C. D. 1008, certain peanut acid oil was assessed for duty as a nonenumerated manufactured article. It was claimed to be a waste or to be raw or unmanufactured. It appeared that the crude peanut oil was neutralized by the addition of a basic solution to produce an edible oil. There remained certain fatty acids, bound to a part lye and neutral oil. By adding sulphuric acid, the lye was neutralized and the fatty acid liberated. There, it was contended that the fatty acids released by neutralizing the lye with sulphuric acid were the same fatty acids as

were in the peanut oil. There was considerable testimony taken upon the point of whether the hydrogen in the acid was the same hydrogen in the native product. The lower court was of the opinion that the further treatment of the soap stock or foots was not undertaken for the purpose of manufacturing such soap stock into a valuable product, but rather it was a continuing process of extraction therefrom of the fatty acids contained in the crude peanut oil. The court there took the view that when such fatty acids were removed from their native state, they were still raw or unmanufactured articles and were not to be considered as manufactured. The identical view is here relied upon by the plaintiff. However, upon appeal—*United States* v. *McLaughlin & Freeman*, 35 C. C. P. A. 34, C. A. D. 368—this court was reversed. The appellate court, after reviewing the evidence, noting particularly the disagreement between the Government and importer's witnesses as to the acid oil being native to the crude product, stated that it was unnecessary to decide that issue because of the court's opinion that the peanut acid oil was not a raw or unmanufactured article, but rather a nonenumerated article manufactured in whole or in part. The court entirely ignored the contention that the acid oil was the same acid oil appearing in the crude oil, although accepting the fact that such might be the case, stating:

It is immaterial, so far as the issue under consideration is concerned, whether the process of subjecting the crude peanut oil to sodium hydroxide is a manufacturing process. By subjecting the "foots" or "sludge" to a chemical process, that is, treating it with sulfuric acid, the involved product—peanut acid oil—is obtained by separating it from the sodium sulfate and other materials contained in the "foots" or "sludge."

We think it is clear that the process to which the "foots" or "sludge" is subjected is not a mere process of cleansing peanut acid oil in order to get it by itself, within the purview of the rule announced * * *.

Peanut acid oil, *per se*, was not present in the "foots" or "sludge." It was obtained from the "foots" or "sludge" by converting the sodium salts of the fatty acids into peanut acid oil. See *Edward Jefferson (Inc.)* v. *United States*, 18 C. C. P. A. (Customs) 322, T. D. 44583.

* * * * * * *

We are of opinion that the issue here is controlled by our decisions in the cases of *American Smelting & Refining Co.* v. *United States*, 12 Ct. Cust. Appls. 212, T. D. 40226; *American Smelting & Refining Co.* v. *United States*, 16 Ct. Cust. Appls. 46, T. D. 42718; *United States* v. *Half Moon Manufacturing & Trading Co.*, 24 C. C. P. A. (Customs) 232, T. D. 48668.

The case of *Balfour Guthrie & Co., Ltd., et al.* v. *United States*, 24 Cust. Ct. 202, C. D. 1232, involved fatty acids which had been derived from linseed oil, palm kernel oil, soybean oil, and corn oil by the Twitchell process of hydrolysis, wherein oil is mixed with water and heated for 36 hours in a closed tank, adding thereto a 1 percent acid decomposing oil which acted as a catalyst. The fatty acids were

established to be free and native to flaxseed, palm kernel nuts, soy-bean, and corn at the time of maturity of the plants and at the time of the compression of the oils therefrom. In fact, it was established that nature's processes begin with the free fatty acids and free glycerin and end with the same, and that there are some free fatty acids present at all times. Counsel for the plaintiff there contended that whatever process is used, nothing has been done to the fatty acids *per se*. They are as they appeared in nature and therefore the separation by means of hydrolysis of the fatty acids from their native tissue is not to be regarded as manufacturing processes.

The court decided adversely to the plaintiff's contention, noting that a cleaning process cannot go much beyond the pronouncement by the court in the case of *United States* v. *Stone & Downer*, 12 Ct. Cust. Appls. 293, T. D. 40296. In holding the merchandise to be a manufactured article, in the *Balfour Guthrie* case, *supra*, the court stated :

* * * Certainly, the mixing of the oils here in question with 25 per centum water and a 1 per centum decomposing oil and then subjecting it to heat for a period of 36 hours in a closed tank, the result of which is that the oil is separated into glycerin and fatty acids, goes far beyond a process of cleansing. To be sure, it is decomposing a compound into its parts, such as would happen naturally over a long period of time, but in the first place there has been a chemical change in the original article, and in the second place a new article emerges separate and apart from the original oil, a condition in which it did not appear before the hydrolysis took place.

The importer appealed the foregoing case to the Court of Customs and Patent Appeals—*Balfour Guthrie & Co., Ltd.* v. *United States*, 39 C. C. P. A. 12, C. A. D. 457, suit 4655. In affirming the decision of this court, the appellate court stated :

There can be no question but that the imported merchandise is produced by a manufacturing process and, therefore, regardless as to the identity of the articles produced by that process with that which is produced in nature, such identity is immaterial. Unquestionably, the imported goods are manufactured articles and were properly so classified by the collector.

From a careful consideration of the evidence in this case, and particularly the effort made on behalf of the plaintiff to establish that the crude tall oil in question was merely an isolation of the fatty acids contained in the pine tree, or, in other words, that the manufacturing effort was nothing more than a separation of the acids from the native tissues of the tree, when viewed in the light of the foregoing cited cases, it appears clearly that the trend of decisions is adverse to the contentions sought to be upheld. In other words, the courts have long held that a mere separation of an article of commerce from its native tissue, such as isolating gutta-percha resin from its native impurities and not advancing the article beyond its clean state or condition and not

affecting the article *per se*, is not a manufacturing process. See *United States* v. *Stone & Downer*, 12 Ct. Cust. Appls. 293, T. D. 40296. However, the courts have not gone so far as to class an article as unmanufactured merely because the final product, after having gone through several chemical changes, closely resembles chemically a native constituent of the natural object from which it was taken. The merchandise in question in this case is a mixture of several fatty acids with other undetermined material. It is not a particular product like turpentine, or rosin, which may be isolated from the tree and obtained free from impurities. In order to obtain tall oil, there must be first a chemical change of the native tissue of the tree to alkalies, and then there must be another chemical change back to acids. These chemical reconversions are admittedly manufacturing operations, and the merchandise resulting from such changes should be identified as a manufactured material, irrespective of whether or not the object thereof is to obtain an acid native to the tree.

It is also abundantly clear that the imported material may not be classed as a waste material. Admittedly, it has been advanced toward its useful state through the action of sulphuric acid upon the residue soaps. The end products in the manufacture of wood pulp were the wood fiber, the turpentine, and the so-called skimmings. Any manufacturing effort, such as treating with sulphuric acid, would advance the soaps beyond the state of a waste into a manufactured article.

For the reasons stated, judgment will be entered in favor of the Government.