(C. D. 1509)

J. E. BERNARD & COMPANY, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 12, 1953)

*Wallace & Schwartz* (*Joseph Schwartz* and *Barnes, Richardson & Colburn* (by *Edward N. Glad*) of counsel) for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*Richard H. Welsh* and *Arthur R. Martoccia*, special attorneys), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: This action involves the classification of merchandise described upon the invoices as greasewood extract sludge, and as greasewood extract, crude, imported from Mexico. Duty was assessed thereon at the rate of 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930 as a nonenumerated manufactured article. The plaintiff claims that it is properly free of duty under the free-list paragraph 1686 as a natural resin, not specifically provided for, or, alternatively, that it is dutiable under paragraph 1558 as a nonenumerated unmanufactured article.

At the trial, Donald Buelow, research chemist of the William J. Stange Co., the ultimate consignee of the merchandise, testified that he majored in pharmaceutical chemistry and holds the degrees of bachelor of science, master of science, and doctor of philosophy. For the past 5 years, he has been working on the production of nordihydroguairetic acid, abbreviated to Ndga for easy reference. This Ndga is used as an antioxidant in the fat and oil industry for the purpose of preserving fats to prevent them from becoming rancid. The witness performed most of the development work as far as concerned the manufacture of the product on a commercial scale. The witness described Ndga as a material obtained from the resin in the surface of the leaves of the greasewood bush.

Lot No. 109, entry 01455, was admitted in evidence as exhibit 1, and lot No. 110, entry 01635, was admitted in evidence as exhibit 2 as samples of the material in question. These samples are small pieces of a dark brownish amorphous material.

The witness further testified that he went to Mexico for the purpose of showing the exporter, the Continental Mexican Rubber Co., how

to acquire the imported material from the leaves of the greasewood bush which grows wild in the desert region. The process of production of the imported material was described by the witness as follows:

The leaves are gathered by stripping same from the bush, known as *larrea divaricata*, and commonly called the greasewood or creosote bush. After having been taken to a central collecting place, the leaves are weighed and then dried by the sun's rays. The surfaces of the leaves, as on the plant, have a slight sticky consistency and mat together when collected, because of that characteristic. The material composing this surface is the resin. When the leaves are dried, they are loaded into trucks or freight cars and brought to the company plant, where they are packed into a large tank. The tank is about 6 feet wide, 8 feet deep, and 30 feet long. An alkaline, aqueous solution is poured on top of them until they become completely immersed. After about 25 minutes' soaking in such solution, the alkaline liquid will absorb the resin in solution. It is then drawn off into empty tanks, and a mineral acid is added, such as hydrochloric or sulphuric acid. This acid action precipitates the resin, causing it to fall to the bottom of the tank. The liquor is then drawn off and the precipitate is shoveled out of the tank and placed on a concrete surface, where it dries by the natural rays of the sun. When completely dried, it is broken up and partially ground, in order to get the material into drums and cut down shipping costs. The material in exhibits 1 and 2 represents the article as it is taken from the drum.

The witness further testified that the object of the process was to obtain the resin present on the greasewood leaf so that it may be processed in order to obtain the desired product which is Ndga. This process of extracting the Ndga, which takes place in this country, consists of dissolving the resin by the use of nitropropane, and undissolved matter, such as leaves, sticks, stones, sand, and other impurities, is removed from the solution. The filtrate is transferred to a still where the solvent is removed by a distillation process. It then goes to a crystallizing kettle. After cooling, a crude crystalline material is precipitated from the solution. This crystalline material is purified by several recrystallizations from other organic solvents, and the final product is the so-called Ndga. A sample of the Ndga was admitted in evidence as illustrative exhibit A. It appears to be a pure white powder.

The witness further testified that he took samples of about a pound from lot 109, represented by exhibit 1, and analyzed it for Ndga content. The result of his anlaysis indicated the actual amount of Ndga that was isolated from these particular samples. The witness described his method of analysis and the results obtained in each barrel, which ranged from 6.08 per centum to 7.24 per centum of

Ndga. The analysis of lot 110, represented by exhibit 2, showed a Ndga content ranging from 4.18 per centum to 8.21 per centum.

The witness was of the opinion that the material covered by exhibits 1 and 2 falls within the definition of resins, as contained on page 974 in the United States Dispensatory, 24th edition, published by J. P. Lippincott Co., Philadelphia, reading as follows:

* * * naturally occurring resins * * * are mostly solid and brittle at ordinary temperatures, amorphous, fusing easily, and volatile only with decomposition. * * * They are largely composed of esters or ethers of organic acids with complex alcohols known as resinols; certain of the latter have reactions similar to the tannins and are designated resino-tannols. Some resins are largely acids or acid anhydrides.

The reason given for his conclusion that the material was a natural resin was that it is amorphous, and a naturally occurring resin, solid and brittle at ordinary temperatures, such as shown by the exhibits, and volatile with decomposition when heated. The witness had studied a considerable number of resins, and the material in question, in his opinion, conforms to the true resin. The witness also was of the opinion that the definition of a resin as it appeared in Webster's New International Dictionary, Second Edition, 1944, on page 2120, would include the article represented by exhibits 1 and 2, because it is amorphous, of vegetable origin, will soften when heated, and burn with a smoky flame, but is insoluble in water. On the basis of his training and experience, the witness expressed the opinion that exhibits 1 and 2 represented a natural resin.

The witness also pointed out that in the process of extracting the resin from the leaves, there was no chemical reaction changing the character of the resin. The resin is merely dissolved in the alkaline solution, and after the removal of the leaves, the alkaline solution is neutralized, thus leaving the resin. Such resin contains the same chemical properties as it did before being subjected to such processes and had not undergone any change whatsoever. They are resins just as they are obtained from the plant itself.

The witness also testified that the process of obtaining Ndga from resins, as published in the Analytical Chemistry, a publication of the American Chemical Society, pages 1393–1396, edition 21, 1949, was not a dependable method of obtaining Ndga from resins, and such method has not received any official recognition; that the method so described is not dependable because it measures some materials other than Ndga, being a photometric method of measurement. The results obtained by that method were much higher in Ndga content than the witness was able to obtain, whereas the method which the witness used was more dependable because, after he had removed the Ndga gravimetrically from the resin, he tested the resin remaining and found that it did not contain any more Ndga. Therefore, he

was of the opinion that the method described by the American Chemical Society also must have measured some other material. The photometric method measures the amount of transmission of light from a solution containing resins and the Ndga together, and inasmuch as the exact results are not obtained, there must be other materials in the resin which contribute to that photometric measurement other than the Ndga.

J. F. T. Berliner, also holding a bachelor's and master's degree in chemistry and a doctor's degree of philosophy, testified for the plaintiff that he was a consulting chemical engineer, and formerly with the United States Bureau of Standards, the Bureau of Mines, and a development engineer with the du Pont Co. before becoming a consultant.

The witness testified that he was retained by the Continental Mexican Rubber Co. in Mexico at the time that company was interested in the creosote bush for possibilities of making a wallboard, and also considered making Ndga as a byproduct of the leaves of that plant. The witness helped the shipper herein become started in the production of the resins in question for shipment to the Stange Co. At the present time, he testified he was retained by the Stange Co. to endeavor to find further industrial uses for Ndga. The witness described the leaf of the greasewood plant as somewhat similar to the leaf on a privet hedge plant, having a bright green color, but, as it ages, it takes on a brownish green color; that the leaf is covered with a very thin film of resin, something like a varnish film, which is sticky to the touch, particularly during the rainy season. When two leaves are pressed together, they will stick. In gathering them, one's hands become quite resinous from handling the leaves. Also, a strong odor is apparent.

The witness further testified that the article, as found in exhibits 1 and 2, has the same chemical nature as the resin in the leaf and contains the same chemical materials; and that those resins may be removed from the leaf by a number of different methods, such as by solvent extraction and by mechanical scraping. The properties of the material, by whatever method removed from the leaf, would be the same. The witness was also of the opinion that the material in question corresponded to the definition of resin, as contained in the United States Dispensatory, *supra*, and Webster's New International Dictionary, *supra*.

The witness was of the opinion that the process of extracting the resin from the leaf, to attain its condition in exhibits 1 and 2, had not changed the material, and it was the same resin as found on the leaf; and that exhibits 1 and 2, in his opinion, represent a natural resin, for the reason that it is resinous in nature; on heating, it becomes sticky; it is water insoluble; it occurs naturally; it is

soluble in solvents, such as alcohol and ether; and it is a natural resin because it occurs naturally, as distinguished from a synthetic resin produced by other means.

The witness further testified that the imported merchandise contains the same constituents as when on the leaf, and the proportions thereof would not change. However, every leaf or every plant has slightly different proportions. The proportions of the chemicals therein change from season to season, and such chemical proportions are dependent on whether the plant is on high ground or low ground and also upon the amount of moisture present; and that no two samples of resin would contain the same amount of Ndga, there being a difference of 1 to 3 per centum. However, the chemical proportions in exhibit 1 are the same as in the leaves from which the sample was taken, and the same would apply to the sample, exhibit 2. The treatment to which the leaves were subjected removed the resin from the leaf, but nothing more. There was no chemical reaction affecting the resin when treated with alkali and acid. It had merely become soluble in the alkali, and when the alkali was neutralized with the acid it came out of the solution.

The witness was positive that both samples were natural resins so far as they came from the plant, and the resin constituent was the same natural resins. The proportions of Ndga therein would not make any difference concerning its nature as a natural resin, that is, as long as it was a dark, translucent, amorphous material, non-crystalline, soluble in solvents, and insoluble in water. The witness characterized the articles by stating that they were natural resins, which also constituted crude Ndga, and would not ordinarily be known as crude resin, as a natural resin is a natural resin, not a crude resin.

The witness further stated that as high a percentage of Ndga as 27 per centum or 40 per centum had never been found in a leaf.

R. Q. Now, assuming that the Customs chemists found 40% ndga in Lot No. 109 and 27% ndga in Lot 110, what would be your conclusion as to the reason for such findings?

\* \* \* \* \* \* \*

A. I ascribe that to a faulty analysis.

The witness would not consider the method used by the customs chemist accurate for the reason that—

\* \* \* the method is dependent on the color developed in a solution of these resins by the addition of a certain chemical known as ammonium molybdate. There are a number of materials besides ndga that are present in these natural resins that would give a color with that reagent. Those are measured in toto by the photometric method and then a correction which is more or less arbitrary is applied but the method is a very difficult one to justify in the assumptions that are made regarding those other colored materials. The method that Doctor Buelow has described, the amount of ndga that is found by analysis is confirmed by the amount of ndga that is extracted from the material.

William H. Bailey, Jr., employed as a chemist with the customs laboratory at the port of Chicago, testified that he holds a bachelor of science degree in chemistry; that he made an analysis of the samples of greasewood extract in question; that the only method available was the one written up in Analytical Chemistry, called the spectrographic-meter method; and that—

Greasewood extract as a resin contains a certain per cent, I guess you would call it a chemical, called nordihydroguairetic acid and we were actually trying to ascertain the percentage of the acid present in the samples that we received.

The witness described the test as one depending upon the optical density of the solution, whether it transmits light easily or whether it retards the transmission of light. The accuracy of the spectrophotometric method, according to the witness, depends upon the degree of light or intensity of light which is caused by the reaction between Ndga and ammonium molybdate which is used as a reagent to form the color. However, he had no way of determining whether or not impurities accompanying Ndga also produced color with the reagent. The witness had never attempted to extract the Ndga from the resin in question by means of the gravimetric method of extraction, not having known of that method.

Counsel for the plaintiff contends that the importations in question are not only unmanufactured but that they consist of natural resins, derived in a similar manner to the natural resin at issue in *P. Biersdorf & Co., Inc.* v. *United States*, 69 Treas. Dec. 986, T. D. 48353.

Counsel for the Government contends that the gums and resins provided for in paragraph 1686 refer to such as are in their crude or natural state, that is, gums and resins which, upon importation, are in the same condition as they are found in nature, whereas the *imported merchandise was processed from the sticky resinous substance found on the leaves of the creosote bush to the ground crystals in their condition as imported*. It is argued in that respect that the alkaline solution, in which the leaves were immersed, removes the resin from the leaves and "extracts from the resin the fats and waxes," and that such processes are more than mere cleansing operations "because, 1st, they remove the fats, waxes, and other impurities from the resin, and, secondly, they change the form of the resin in its natural state so that, after drying, it is crystalized." It was further argued that the evidence established that the more processing to which the creosote bush leaves were subjected, the greater the quantity of Ndga would appear in the resultant crystals. The Government relies upon the case of *Werner G. Smith Co. Div. Archer Daniels Midland Co.* v. *United States*, 27 Cust. Ct. 121, C. D. 1357, affirmed in *Werner G. Smith Co. Div. Archer Daniels Midland Co.* v. *United States*, on December 17, 1952, suit 4705, 40 C. C. P. A. (Customs) 90, C. A. D. 503. The Government also cites the case of *United States* v. *Half Moon Manufacturing & Trading Co.*, 24 C. C. P. A. (Customs) 232, T. D. 48668.

The only question arising in this case is whether or not the merchandise imported herein consists of a natural resin or whether it is a manufactured article, that is, an article manufactured from a natural resin, or whether the merchandise is unmanufactured.

Much testimony was adduced relative to the percentages of a chemical, known as nordihydroguairetic acid, ordinarily referred to as Ndga, which was contained in the imported product. However, it was not Ndga which was imported, but the crude material from which it was ultimately derived, which is at issue in this case. It is the opinion of the court that the quantity of Ndga contained therein is entirely immaterial. Is the imported product a manufactured article, or is it a natural resin in a condition as removed from its native state and put in a transportable form?

A careful consideration of the evidence fully establishes that the merchandise at issue, when separated from its natural habitat, was not at the same time cleansed of the fats and waxes contained therein, nor was the form changed to a crystalline state, as contended by counsel for the Government. The testimony of the two well-qualified chemical engineers fully and clearly describes the process where the material from the leaves of the greasewood or creosote plant was removed by the means of being dissolved in an alkaline solution, and in order to precipitate the material from the alkaline solution, neutralizing acid was added. The precipitated material not only contained the resinous material upon the leaves but it also contained everything else thereon which had been dissolved by the alkaline solution. All that is done after the resinous material upon the leaves is precipitated is to dry it in the sun and break it up so as to pack it into drums for shipment. In the opinion of the court, less labor could not have been expended in order to bring the article to a condition that it may be imported. None of the cases cited by counsel for the Government are in point. In the *Smith* case, *supra*, a waste product, resulting from the manufacture of wood pulp, was treated with sulphuric acid in order to produce, by means of a chemical reaction, the tall oil in question. In the *Half Moon* case, *supra*, it was contended that, in the manufacture of starch from wheat flour, the residue remaining after the removal of the starch was a waste, whereas the Government contended that it was a manufactured byproduct. The issue as to whether or not the imported product there in question was a natural product separated from its surrounding tissue was not raised.

In the case of *Hampton, Jr., & Co.* v. *United States*, 6 Ct. Cust. Appls. 392, T. D. 35926, molybdenite, a mineral substance, was freed from the rock or gangue formation in which it was found by crushing the rock, without crushing or changing the mineral itself. There, the court stated:

* * * It may be generally said that it has been uniformly held in customs interpretation that the application of processes necessary to produce an article

from its native condition and to bring it into a condition that it may be imported, without affecting its *per se* character, is not regarded either as a manufacturing process or as a process advancing it in value or condition.

In the case of *United States* v. *Stone & Downer*, 12 Ct. Cust. Appls. 293, T. D. 40296, the court stated regarding manufacturing process—

As a general rule, a mere cleansing process, the purpose of which is to isolate the article of commerce from impurities, and which does not advance it beyond a clean state or condition, and which does not affect the article per se, can not be said to be such a manufacturing process as is provided for in paragraph 1106, supra * * *.

In the case of *P. Biersdorf & Co., Inc.* v. *United States, supra*, cited by the plaintiff, the article imported was gutta-percha resin. It also was assessed for duty as a nonenumerated manufactured article. The plaintiff contended that it was free of duty as natural resins. It was agreed between counsel that the merchandise at issue consisted of resin extracted from gutta-percha by use of kerosene in the extraction process, and the question was whether resin so extracted was comprehended within the provision for "natural" resins. In holding that the product imported in that case was a natural resin, the word "natural" in paragraph 1686 of the Tariff Act of 1930 was construed as having reference to a product taken from its natural habitat by some process of separation, as distinguished from a synthetic substitute for such product. The court there also cited the case of *United States* v. *Sheldon*, 2 Ct. Cust. Appls. 485, T. D. 32245, where, in holding that certain gum resin was in a crude state, the appellate court stated:

Considering the resin content alone, as in the tree, its crudest condition, the object being to take it from the tree and pack it in barrels, no process or treatment has been applied thereto which has advanced its value or condition as found in the tree, other than essential to the *proper* packing. The first process recovered it from the tree but did not change the rosin content *per se*. The second process reclaimed it from the turpentine and the dirt, leaves, and insects deposited therein by the first process, but did not change the rosin *per se*. The result of all these processes left it in a condition for proper packing and advanced it no further *from its crudest, natural, parent condition* in the tree than essential to its proper packing. [Italics quoted.]

\* \* \* \* \* \* \*

* * * It is "not chemically a new body, or a new creation." On the contrary it is one of the same elements, one of the same creations, one of the identical things that was placed in the retort before and which is returned therefrom in its natural state.

The same may be stated concerning the greasewood extract here in question. It was a natural resin in its form as attached to the leaves and is still a natural resin in the form imported. The Government witness stated that greasewood extract was a resin and that his purpose in analysis was to endeavor to determine what quantity of Ndga was present in it.

From the evidence adduced it is clear that the greasewood extract in its imported condition as shown by exhibits 1 and 2 is a natural resin. It is, therefore, classifiable under the provisions of paragraph 1686, Tariff Act of 1930, as "other natural gums, natural gum resins, and natural resins, not specially provided for," rather than under paragraph 1558 as a nonenumerated manufactured article.

Judgment will therefore be entered in favor of the plaintiff directing the collector to reliquidate the entries and refund all duties taken upon lot numbers 109 and 110, covered by entries 01455 and 01635, respectively, and in all other respects the protest is overruled.