(C. D. 1714)

J. E. BERNARD & COMPANY, INC. v. UNITED STATES

United States Customs Court, First Division

(Decided July 7, 1955)

*Wallace & Schwartz* (*Barnes, Richardson & Colburn* by *Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: In this case, 11 protests covering 30 entries were, by stipulation of the parties, consolidated for trial. The merchandise here involved consists of certain material imported from Mexico, part of which was invoiced as greasewood extract or greasewood extract, crude, and the remainder as refined powdered greasewood extract or refined greasewood extract. That portion of the importation described as greasewood extract or greasewood extract, crude, was classified under paragraph 1558 of the Tariff Act of 1930 as nonenumerated manufactured articles and assessed with duty at 20 per centum ad valorem. Part of the remaining materials was classified under paragraph 5 of the said act as chemical compounds or mixtures and assessed at 25 per centum ad valorem, while the balance was classified under paragraph 1 of said act as acids, not specially provided for, and assessed at 25 per centum ad valorem. The plaintiff contends that all the merchandise is properly free of duty under paragraph 1686 of the tariff act as natural resins, not specially provided for, or, alternatively, that the crude extract should be admitted free under paragraph 1686 and the refined extract classified under paragraph 1558 of the act as nonenumerated manufactured articles at the rate of 20 per centum ad valorem.

The defendant, in its brief, concedes that the merchandise covered by entry 2060 in protest 161133–K, invoiced as greasewood extract; entries 2541, 2884, and 3014 in protest 162856–K (also invoiced as greasewood extract); and entry 1387 in protest 163797–K (similarly described) is the same as the merchandise before the court in the case of *J. E. Bernard & Company, Inc.* v. *United States*, 30 Cust. Ct. 122, C. D. 1509 (protest 160720–K), and that the merchandise covered by the above-enumerated entries should be held, in accordance with the said decision, C. D. 1509, *supra*, free of duty under paragraph 1686 of the Tariff Act of 1930, as natural resins.

The Government further admits that the collector was in error when he classified the merchandise covered by 6 other entries, to wit, entries 7930, 8085, and 7866 in protest 162844–K; entry 7049 in protest

164574–K; entry 8326 in protest 166085–K; and entry 7642 in protest 177706–K under paragraph 5 of the Tariff Act of 1930 as chemical compounds or mixtures, dutiable at 25 per centum ad valorem, and asserts that said merchandise is properly classifiable, as is the merchandise in the 19 remaining entries, under paragraph 1 of the Tariff Act of 1930, as acids, not specially provided for, at 25 per centum ad valorem.

The record in the *J. E. Bernard* case, *supra*, C. D. 1509, was incorporated into the record in the case at bar.

The issue before the court, briefly stated, is, therefore, whether material, characterized in the invoices as refined greasewood extract or refined powdered greasewood extract, should be classified under paragraph 1686 of the Tariff Act of 1930 as natural resins under the authority of the previous *J. E. Bernard* case, *supra*, C. D. 1509, or considered as alternatively falling under paragraph 1558 of the said act as nonenumerated manufactured articles, as claimed by the plaintiff, or held to be an acid, properly classifiable under paragraph 1 of the Tariff Act of 1930 at the rate of 25 per centum ad valorem, as contended by the Government.

The pertinent parts of the statutes under consideration are as follows:

PARAGRAPH 1. Acids and acid anhydrides: Acetic acid * * * and all other acids and acid anhydrides not specially provided for, 25 per centum ad valorem.

PAR. 1558. That there shall be levied, collected, and paid * * * on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1686. Gums and resins: * * * and other natural gums, natural gum resins, and natural resins, not specially provided for.

At the trial of the case, only two witnesses were called, one by each party. Both of these witnesses had testified at the trial of the previous *J. E. Bernard & Company, Inc.*, case, *supra*, C. D. 1509.

Donald W. Buelow, whose qualifications as a chemist were admitted (R. 4), was called as a witness by the plaintiff. He testified that the material, identified as defendant's illustrative exhibit 1 in the instant case, is greasewood extract, crude, "similar to the merchandise that was the subject of C. D. 1509" (R. 22). On cross-examination, he testified concerning defendant's illustrative exhibit 1 as follows:

X Q. Would you call this greasewood extract refined powdered?—A. No.

X Q. So that you wouldn't call the merchandise in C. D. 1509 greasewood extract refined powdered, would you?—A. No. (R. 22.)

The witness also described the contents of defendant's illustrative exhibit 2, as "greasewood extract crude" (R. 23). However, he characterized the substance contained in the jar, defendant's exhibit 3, as "refined greasewood extract" or "refined powdered greasewood

extract" and stated that it was similar in every material respect to the merchandise now under consideration (R. 22–23).

In the incorporated case, this witness had testified that the greasewood extract involved therein (in which the same method was employed in isolating and processing the crude greasewood extracts as in the instant case) was obtained in the following manner:

The leaves were stripped from a shrub, known as *larrea divaricata*, commonly called a greasewood or creosote bush. The leaves were then collected and sun-dried. They were next placed in a large tank and immersed in an alkaline, aqueous solution and allowed to stand for 20 to 25 minutes and soak in the solution, so as to remove and dissolve from the plant leaves a certain natural gummy resin. The liquid was then drawn off into another tank and acidified. This acid treatment caused the resinous substance to be precipitated to the bottom of the tank, from which it was recovered by shovels, after the liquid covering had been drawn off. The solid material was then sun-dried on concrete surfaces. When completely dry, it was broken up and partially ground. In this latter condition, it was imported in the form and shape exemplified by plaintiff's exhibits 1 and 2 in protest 160720–K (R. 8–9a).

In the incorporated *Bernard* case, *supra*, plaintiff's witness Buelow testified as follows:

Q. What is the object of the grinding?—A. Merely to cut down the shipping costs to get more material into a given drum. Otherwise the products would be so large they would take up too much space.

Q. Now, what is the object of this whole process which you have described so far?—A. The object has been to obtain the resin that was present on the leaf of this particular plant so that we may later process it further and obtain the desired product.

Q. Is the resin or rather the material as it appears in Exhibits One and Two the same chemically as the sticky substance to which you referred as a resin which appears on the leaf?—A. Yes, it is. That is, all the same chemical properties as the original material on the leaf.

Q. And so you come down to the form in which it is found in Exhibits One and Two and in which condition it is imported; is that correct?—A. Yes. (Protest 160720–K, R. 9a–10.)

The witness then testified in the incorporated case that after the material, exemplified by plaintiff's exhibits 1 and 2, had been received in the United States, it was treated with a solvent, which dissolved the resinous material. The undissolved matter (consisting of leaves, sticks, stones, sand, and other waste) was filtered out and the remaining material transferred to a crystallizing kettle. The crude crystalline material was then further purified by several recrystallization processes to obtain the end product known as "Ndga."

The witness, in the incorporated case, was then shown illustrative exhibit A in protest 160720–K and described it as "pure ndga" (R. 11), after which he was further examined as follows:

Q. What is ndga such as is represented by Plaintiff's Illustrative Exhibit A used for?—A. It is used as an antioxidant in the preservation of fats and oils. (R. 11.)

Mr. Buelow also testified that he had analyzed several samples of exhibits 1 and 2 in protest 160720–K for the purpose of determining the percentage of Ndga content in the various specimens. From his analyses, he found 4.18 per centum to 8.21 per centum Ndga in the materials analyzed (R. 13–14, C. D. 1509). In the instant case, the witness stated that the amount of Ndga found in the foregoing analyses is exceptionally low; that, in greasewood extract, crude, or sludge like that before the court in the incorporated case, the average Ndga content would run from 25 per centum to 50 or 60 per centum, while, in the refined powdered greasewood extract, the Ndga content would range "from 50 to 90 some odd per cent."

The witness admitted that the only essential steps in processing the crude greasewood extract, typified by defendant's illustrative exhibits 1 and 2 herein, to obtain the end product or "Ndga" consists of crystallizing and recrystallizing the material to purify it and increase the percentage of Ndga content (R. 27–29).

Mr. Buelow then testified as follows:

X Q. Now, to obtain merchandise such as Exhibit 3, what is done to Exhibit 3 that is not done to Exhibit 1? *In Mexico I am speaking of now*?—A. It was merely placed in a solution and the material in 3 was crystallized out from that solution through several crystallizations to obtain that which is in Number 3. (R. 28.) [Italics ours.]

 * * * * * * *

X Q. And, isn't it true you cannot obtain the Ndga without these crystallization processes?—A. That's right. (R. 28.)

 * * * * * * *

X Q. Outside of the cleansing process then, what else is there that you do besides crystallizing it to obtain the Ndga?—A. That is all. (R. 29.)

The witness further stated, in the incorporated case, that a natural resin is amorphous, and not crystalline, and agreed with the following definition of a natural resin, given in "Webster's New International Dictionary, Second Edition, 1944," published by G. & C. Merriam Co. at page 2120:

Any of various solid or semisolid organic substances, chiefly of vegetable origin, *amorphous* and yellowish to brown (usually), transparent or translucent, and soluble in ether, alcohol, etc., but not in water; specif., pine resin. Resins soften and melt on heating and burn with a smoky flame. Electrically they are nonconductors. Many are produced as exudates from plants (esp. pine and fir trees)

either alone or as mixtures with essential oils, with gums, etc., being chiefly excretion products; * * * The chief constituents of resins are certain esters, resin acids, and "resenes." [Italics ours.]

At page 16 of the present record, the following appears:

X Q. Now, I noticed that in that definition, Webster referred to the material as being amorphous without any qualifying words. Do you agree with that definition or don't you agree with that definition?—A. Yes.

X Q. And, you so stated in C. D. 1509 that you agreed with Webster's definition and you specifically referred without qualification to the state of that merchandise as being amorphous, am I right?—A. That is right.

X Q. And, you gave your own opinion when you stated your reason for declaring the merchandise a natural resin; you said one, because it is amorphous without any qualifying statements prior thereto or subsequent thereto, right?—A. That's right.

X Q. So that a basic element of a natural resin is the fact that it must be amorphous, am I right?—A. That is what I said.

The witness Buelow further testified in the present case as follows:

X Q. Isn't it a fact that your company, when ordering the refined, specifically requests and provided in their contract for 95 per cent pure or better Ndga content?—A. They did.

X Q. That's right. Isn't it a fact that your company when ordering the merchandise which has the high Ndga content as set forth by you refers to it continuously as refined Ndga?

\* \* \* \* \* \* \*

A. Yes, they refer to it that way.

X Q. They always refer to it as refined Ndga?—A. Yes.

X Q. And, when they buy the merchandise which was the subject of C. D. 1509, they don't refer to it as refined Ndga, do they?—A. They didn't receive it as that.

X Q. Do they or don't they?—A. It is not referred to it.

X Q. They refer to it as greasewood extract crude or sludge, is that right?—A. Or refined powdered greasewood extract. (R. 20–21.)

In the incorporated case, the plaintiff also called as a witness one Dr. J. F. T. Berliner, who had had considerable experience in refining natural resins, obtained from creosote bushes in Mexico to produce Ndga (R. 45–46, protest 160720–K). This witness, after explaining the preliminary processes followed in collecting the raw material, stated that Dr. Buelow had correctly described the process in his testimony. He then gave as his opinion that the materials in evidence therein as plaintiff's exhibits 1 and 2 are chemically the same materials as the natural material removed from the plant leaves (R. 47).

The witness then stated that said exhibits 1 and 2 therein conform to the following definition of resin, found in the United States Dispensatory, 24th edition, 1947, page 974:

Naturally occurring resins are mostly solid and brittle at ordinary temperatures, amorphous, fusing easily, and volatile only with decomposition. They are largely

composed of esters or ethers of organic acids with complex alcohols known as resinols. Certain of the latter have reactions similar to tannins and are designated resino-tannols. Some resins are largely acids or acid anhydrides. (R. 48, C. D. 1509.)

He also stated that he agreed with the definition found in Webster's International Dictionary, *supra* (R. 48–49). This witness was not asked concerning merchandise such as defendant's exhibit 3 in the instant case or plaintiff's illustrative exhibit A in the incorporated case, a sample of pure Ndga.

Referring again to the testimony of Dr. Buelow in the present case, the following answers are enlightening in determining the nature of the products in defendant's exhibit 3:

X Q. Is the merchandise before this Court, the powdered refined greasewood extract, is that an acid?—A. It is largely a resin acid.

X Q. Do the initials Ndga in your opinion and based upon your very fine experience, fit the definition for nordihydroguaiaretic acid?—A. Yes, sir.

X Q. You have stated that your firm ordered the merchandise, such as Exhibit 3, when they ordered it they referred to it as refined Ndga?—A. Yes.

X Q. And, the merchandise they received, that which is before the Court, was refined Ndga?—A. No, it was not.

X Q. What was it?—A. It was refined powdered greasewood extract.

X Q. Did you return it because it was not according to the contract?—A. We did not.

X Q. Did you pay them any less because it was not according to any contract?—A. No.

X Q. So that you accepted it as fulfilling your order for refined Ndga, did you not?—A. We accepted it, yes.

X Q. Now, are you familiar with the prices which your firm pays for these various merchandise? Are you familiar with the prices which your firm pays for these various merchandise, Exhibits 1, 2, and 3?—A. Yes, I believe I am.

X Q. May I refresh your recollection. The record reveals that for the merchandise, the subject of C. D. 1509, your firm paid $1.85 and $1.114 per kilo per case. Now, I call your attention to the fact that in the case at bar, practically all of the merchandise referred to as refined or powdered or any combination or separation of those words, your firm paid $39.68 per kilo and for some, because pursuant to contract, you paid a lesser sum—you paid $26.45, while for those in the cases at bar which are referred to as crude, you paid from as little as $8.18 per kilo to $9.25 per kilo. Now, can you explain to the Court why your firm paid as little as $1.11 and as high as $39.68 for these types of merchandise and what the differences were that brought about the different prices?

\* \* \* \* \* \* \*

A. I don't know. I am not so certain that there is such a difference in the prices because I was not involved in the financial transactions concerning the prices to be paid for this material, but we—I believe that a lesser price was paid for that so-called greasewood extract crude than what there was for some of the later shipments, partially because of its higher Ndga content.

X Q. So that the key to the value of these articles, 1, 2, and 3, before the Court is the Ndga content?—A. I don't know whether that is the key entirely, because there are other financial things involved.

X Q. Would you say that the basic or most important thing is the Ndga content?—A. I would say it has a great deal to do with it.

X Q. The merchandise in C. D. 1509 you testified had approximately a 4 to 8 per cent of Ndga?—A. That's correct.

X Q. And, that is the merchandise for which you paid $1.11?—A. Yes.

X Q. The merchandise referred to in this case as refined powdered and for which you paid $39.68 you said had about 95 to 97 per cent of Ndga, right?—A. I said that it would vary all the way from 60 to over 90 per cent of Ndga.

X Q. As a matter of fact, you specified or your firm specified in its contract that it must have a 95 per cent Ndga content?—A. Yes. (R. 33–37.)

The witness further testified that the material, represented by defendant's illustrative exhibit 1, was not put into a crystallizing kettle at all in Mexico but that that represented by defendant's exhibit 3 herein had been crystallized and recrystallized many times in Mexico.

The witness then testified further as follows:

X Q. In C. D. 1509, you testified that after the merchandise like Exhibit 1 came into this country, it was first cleansed and then it went through a number of crystallizing processes, right?—A. Yes.

X Q. And that you then obtained the final or end product called Ndga?—A. Yes.

X Q. Now, Exhibit 3 has already gone through those processes in Mexico which Exhibit 1 had to go through in this country?—A. That's right. (R. 38–39.)

On behalf of the Government, William H. Bailey, Jr., a United States Customs chemist, whose qualifications were admitted by the plaintiff, testified that he analyzed the merchandise from the importation in question similar to defendant's exhibit 3; that he used as his guide for making the analysis the only published authority with which he was familiar at that time and found the sample to be virtually pure Ndga, approximating the prescribed melting point for pure Ndga; and that the material was an acid, to wit, nordihydroguaiaretic acid, which is an organic acid (R. 50–52). He further testified that the material examined by him was not amorphous but was crystalline.

It is true that, on cross-examination in the incorporated case, C. D. 1509, protest 160720–K, this witness testified that he was not familiar with the gravimetric method which plaintiff's chemists claimed to have used in making their analyses and which they admitted had never been published up to that time, and through which they found a much lower Ndga content in some samples than that found by Mr. Bailey. Yet, the plaintiff's principal witness admitted that the percentage of Ndga was generally much higher than that shown by his analyses.

A visual examination of defendant's exhibit 3 herein, which the Government contends is substantially pure Ndga and which the plaintiff ordered as refined Ndga, having over 95 per centum Ndga, with plaintiff's illustrative exhibit A or pure Ndga in evidence in the incorporated case, indicates them to be essentially the same, if not identical.

Since it is conceded herein by the Government that the merchandise described as greasewood extract is properly classifiable under paragraph 1686 of the Tariff Act of 1930 and should be admitted free of duty under the authority of the *J. E. Bernard & Company, Inc.*, case, C. D. 1509, *supra*, we hold that the merchandise represented by entry 2060 in protest 161133-K; entries 2541, 2884, and 3014 in protest 162856-K; and entry 1387 in protest 163797-K is entitled to free entry under paragraph 1686 of the Tariff Act of 1930 as natural resins, as claimed.

However, we are definitely of the opinion that the *J. E. Bernard & Company, Inc.*, case, *supra*, is not controlling with reference to the remaining entries. The merchandise with which we are now dealing is not crude greasewood extract referred to as sludge in the former *J. E. Bernard & Company, Inc.*, case, but is a highly refined and concentrated product, from which practically all, if not all, of the amorphous natural resins have been removed through processes which have resulted in a manufactured product almost wholly crystalline in condition and which has ceased to be a natural resin and has become an organic acid.

Since the Government, in its brief, concedes that the collector, in classifying certain entries under paragraph 5 as chemical compounds or mixtures, was in error, the case of *Aetna Explosives Co.* v. *United States*, 9 Ct. Cust. Appls. 298–307, T. D. 38238, has no application.

The plaintiff, in its brief, cites the case of *United States* v. *Merck & Co.*, 8 Ct. Cust. Appls. 141–143, T. D. 37270, in support of its contention that, to be considered an acid or acid anhydride, the item under consideration must be so designated in the trade and commerce, and then makes the following statement:

> The unrebutted testimony in this case shows that the refined powdered greasewood extract is sold not as an acid or an acid anhydride, but as refined powdered greasewood extract.

However, that statement is not borne out by the testimony of Dr. Buelow, the plaintiff's principal witness in both the incorporated case and the instant case. He testified that his company ordered the product now under consideration as refined Ndga and accepted it as fulfilling an order for refined Ndga (R. 34). Throughout the entire trial, it was repeatedly pointed out that the purpose of refining the crude product was to obtain an end product, known as Ndga, a

crystalline material, the real name of which is nordihydroguaiaretic acid.

In "The Merck Index" of chemicals and drugs, 6th edition, 1952, at page 686, the material in question is discussed under the heading "Nordihydroguaiaretic Acid. NDGA," and at no point in the discussion under that heading does the term greasewood extract occur. It gives the use of the product as an antioxidant in fats and oils and states that it is "commercially available."

That the merchandise, of which defendant's exhibit 3 is representative, is manufactured admits of no doubt. The materials involved in the incorporated case were merely taken from their natural state by the simplest means available and shipped to this country without any further processing, while the substantially pure Ndga product now before us was treated by numerous processes in Mexico to put it in substantially, if not completely, usable form, upon its arrival in this country.

The case of the *United States* v. *Stone & Downer*, 12 Ct. Cust. Appls. 293, T. D. 40296, cited by the plaintiff, has no application, because there is no merit in contending in the instant case that all that was done to the product now before us was merely to cleanse it, nor can we agree that the case of *United States* v. *Sheldon & Co.*, 2 Ct. Cust. Appls. 485, T. D. 32245, is controlling. It is obvious that the merchandise now before us is not in a crude state. It is a refined manufactured product, which is an acid, properly classifiable under paragraph 1 of the Tariff Act of 1930.

We are also of opinion in this case that the plaintiff herein has failed to overcome the presumption of correctness attaching to the collector's action in classifying under paragraph 1 of the Tariff Act of 1930 as acids, not specially provided for, the refined greasewood extract.

The protests covering the merchandise in entry No. 2060 in protest 161133-K; entry Nos. 2541, 2884, and 3014 in protest 162856-K; and entry No. 1387 in protest 163797-K, all of which merchandise is described as greasewood extract or greasewood extract, crude, are sustained, and the merchandise involved therein held properly free of duty under paragraph 1686 of the Tariff Act of 1930 as *natural resins*.

The protests covering the merchandise involved in entries 7930, 8085, and 7866 in protest 162844-K; in entry 7049 in protest 164574-K; in entry 8326 in protest 166085-K; and that in entry 7642 in protest 177706-K herein, which said merchandise was classified under paragraph 5 of the Tariff Act of 1930 as chemical compounds or mixtures, are overruled, without sustaining the collector's classification.

The protests covering the remaining entries involved herein are overruled. As to this merchandise, we hold it to be properly dutiable under the provisions of paragraph 1 of the Tariff Act of 1930 at the

rate of 25 per centum ad valorem as *acids, not specially provided for*, as classified.

Judgment will be rendered accordingly.